491 P.2d 443

STATE of Arizona, Appellee,

v.

David R. MUMBAUGH, Appellant.

No. 1845.

Supreme Court of Arizona,
In Banc.

Dec. 9, 1971.

Dushoff, Sacks & Corcoran by Robert J. Corcoran and Jay Dushoff, Phoenix, for appellant.

Gary K. Nelson, Atty. Gen. by Carl Waag, Former Asst. Atty. Gen., William P. Dixon, Asst. Atty. Gen., Phoenix, for appellee.

UDALL, Justice:

This is an appeal by the defendant, David R. Mumbaugh, from a conviction of first degree murder. He was sentenced to life imprisonment in the Arizona State Prison.

On September 30, 1966, the defendant was charged with the first degree murder of Laura Bernstein. Defendant pleaded "not guilty" to the charge and a Motion to Suppress the confession and other tangible evidence was made and a hearing was held on this Motion and denied. Defendant waived trial by jury and the cause was presented to the Honorable George M. Sterling, late Judge of the Superior Court.

Although the defendant lists six questions for this Court to consider, basically they all revolve around one issue: Whether the defendant was timely and properly given his Miranda warnings as required by the United States Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). If they were not, then the confession must be suppressed along with the "fruits" of that confession.

Since the facts are extremely important in deciding this question, we will set them out in detail as follows: Laura L. Bernstein was the victim of a homicide at or about 7:30 p. m. on September 21, 1966; death resulted from multiple stab wounds. Within minutes, defendant reported to the Tempe Police Department that he had found the body of a dead girl and directed them to the scene of the crime, the veranda of the Casa Loma Hotel located at Mill Avenue and 4th Street in Tempe. Defendant at this time explained to the police how he found the body and this explanation was to become the basis of subsequent inconsistencies in his story. These inconsistencies are heavily relied upon by the defense and will be dealt with later.

The following day Det. Schoenfeld of the Tempe Police went to defendant's home to gather information. He inquired into defendant's activities around the time he found the body. On Saturday, September 24, Det. Schoenfeld again visited defendant at his home. From this interview he determined that immediately after defendant had found the body of Miss Bernstein, he went across the street to an apartment and told two men, Messrs. Bennett and Toth, what he had found. All three men then ran outside and defendant proceeded by himself to the police station. That same afternoon, Lt. Hill asked defendant to come down to the police station, which he did. They went to the scene of the crime, and the defendant re-enacted his version of how he had come upon the body, where he had come from and exactly what he saw upon arrival. Since there were fingerprints on the flashlight and footprints on the ground near the body, the police asked defendant if he would consent to be fingerprinted and to bring in his shoes to see if the prints were his in order to facilitate the investigation. Defendant complied. That same night, Det. Schoenfeld went to defendant's home and secured the clothing which defendant claimed he wore on the night of the homicide.

At or about this time the police became aware of small inconsistencies in defendant's story. Since defendant relies upon them we have set them out:

1. Defendant on the night of the murder told police he was coming *from* Dana Bros. Later he said he was going *to* Dana Bros.

2. Defendant told police the flashlight near the body was burning when he discovered the body. The police upon arrival at the scene found the flashlight in the "on" position but not burning.

3. Defendant reported leaving a "friend" with the body when he arrived at the police station yet the two men defendant sought help from had never met him before.

4. Defendant's shoes had blood stains on them yet defendant did not remember stumbling into the body as he came upon it.

5. Defendant said there was a second flashlight at the scene of the murder but it was never found.

On September 25th, defendant came to the Police Station inquiring into any new

developments in the case. Lt. Hill used this opportunity to try to clarify these inconsistencies. Finally, on September 29th Det. Schoenfeld called defendant and asked him to come down to the station house. At this time the police were aware of other inconsistencies which had arisen:

1. Defendant said he wore a white shirt the night of the murder but Officer Carpenter reported defendant wearing a plaid shirt.

2. Defendant said he told Messrs. Bennett and Toth that he had found a girl he "thought was dead." This conflicted with a statement by Mr. Toth that defendant said, "A girl has been murdered."

3. Defendant claimed the blood on his shoes resulted from a bruise he incurred from falling on the way to the police station. No such bruise was observed.

Defendant agreed to come and arrived at 8:05 p. m. and related his story in detail to the police officers. According to the police-report, at about 8:56 p. m. Lt. Hill for the first time notified defendant that they were aware of the inconsistencies in his story and that before they asked him any specific questions concerning these inconsistencies they would give him his Miranda rights. Defendant admits making the confession which followed but contends that his rights were not given until immediately after he confessed. The police report indicated, and the officers testified, that defendant read the sheet, told police he knew of these rights and then signed a waiver. The police then enumerated the inconsistencies they were aware of. Defendant at first changed his story to meet these and then finally:

"Hill:

Now David, now is the time when you are going to have to stand on your own two feet and straighten up your own problems. It's going to be up to you. Nobody else is going to straighten up your problems for you."

\* \* \* \* \* \*

"[He then sat very still for several seconds and stated,] 'I did it. I was going to Dana Bros., she started to scream. I said what's the matter. She said get away.' [Mumbaugh paused for several seconds and stated,] 'Then I hit her and when she turned I stabbed her. Then I ran until I got my senses.' "

\* \* \* \* \* \*

"Mumbaugh:

. . . I came up and the flashlight came on and that's when I saw her. I came up and she started to scream. I said what's the matter and I hit her. When I did she turned. I didn't hit her very hard, in the arm I think."

"Hill:

What hand did you hit her with?"

"Mumbaugh:

I hit her with my left hand. I hit her only once. I pulled the knife out with the same hand."

"Douglas:

How did you get your knife out so fast?"

"Mumbaugh:

I carried it in a special way in my back pocket, above my handkerchief."

"Hill:

"How many times did you stab her?"

"Mumbaugh:

I don't know. I stabbed her and I stabbed her. I don't know how many times. [At this point Mumbaugh was having some difficulty with his words as he was sobbing at times while talking.]"

"Hill:

Have you ever attacked anyone before?"

"Mumbaugh:

No. If I did they would be dead. I know judo and karate. I took lessons."

"Hill:

David, how did you get blood on your shoe?"

"Mumbaugh:

My feet might have hit her."

"Douglas:

How?"

"Mumbaugh:

I kicked her once or twice to make sure she was dead."

"Hill:

Where?"

"Mumbaugh:

In the head, of course."

"Douglas:

Did you stab her in the head?"

"Mumbaugh:

I don't think so."

"Douglas:

Where did you stab her?"

"Mumbaugh:

I thought twice in the back and twice in the chest . . . ."

"Hill:

David, what did you do with the knife?"

The defendant then proceeded to tell the police that he had thrown the murder weapon into a canal near 48th Avenue. A subsequent search uncovered the murder weapon. He also told police that the shirt he wore the night of the murder was in the waste paper basket in his room. A subsequent search consented to by defendant's father uncovered the shirt. Defendant later made a second confession when his parents arrived at the police station:

"David:

I did it."

"Mrs. Mumbaugh:

Why?"

"David:

I don't know."

"Mrs. Mumbaugh:

How?"

"David:

With my switchblade. . . ."

\* \* \* \* \* \*

"Mr. Mumbaugh then approached his son and stated:

'Son, do you know what you're saying?' "

"David:

Yes I do. Ever since the 8th grade I've wanted to kill somebody. [At this point Lt. Hill read the above mentioned rights to Mr. Mumbaugh and showed him his son's signature, which he identified.]"

## CUSTODIAL INTERROGATION

Our first concern is to determine whether the defendant was timely given his constitutional rights as enumerated in Miranda v. Arizona, supra. In order to answer this question we must determine if at any time defendant was under custodial interrogation within the meaning of *Miranda*. What constitutes "custodial interrogation" is a question many courts have dealt with since *Miranda* in 1966, but the question still perplexes courts which seek to lay down a consistent, coherent body of rules the police can predictably work under in performing their job. It is an extremely important concept since the police may not interrogate any person in custody unless his rights are first given and a valid waiver is made. Where defendant is not in custody or deprived of his freedom his answers are not deemed compelled, while the use of inculpatory statements by the prosecution stemming from custodial interrogation without the proper warning and waiver is prohibited. The Supreme Court in *Miranda* defined custodial interrogation as follows:

"By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612.

By way of a footnote the Supreme Court then stated that the "focus of the investigation" test as used in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) is defined in the same manner as custodial interrogation. Since it is contended that the defendant was the "focus" of the interrogation and, under *Escobedo*, was entitled to the Miranda Warnings, this

**594**

requires further discussion. It seems that the Miranda test of custodial interrogation supplanted the Escobedo "focus" test or at least equated the focusing test for the accusatory stage with the custodial interrogation test. Miranda v. Arizona, 384 U.S. at 444, n. 4, 86 S.Ct. at 1612; Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968); Lowe v. United States, 407 F. 2d 1391 (9th Cir. 1969); United States v. Hall, 421 F.2d 540 (2nd Cir. 1969). In *Lowe* the U. S. Court of Appeals, in fact, specifically held:

> "The Court's decision in Miranda clearly abandoned 'focus of investigation' as a test to determine when rights attach in confession cases. [citations omitted] The test now is whether or not the person 'has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" (407 F.2d at 1396).

In *Hall*, Judge Friendly held that "focus" was no longer "the appropriate test" since *Miranda* marked a "fresh start" in describing the point in time when the constitutional protection of the Fifth Amendment begins. The reason for this is that *Miranda* has shifted the basis of its rule to emphasize the Fifth Amendment privilege against self-incrimination rather than the Sixth Amendment of *Escobedo*.[1]

 Custody, rather than focus, is the point in time when this privilege against self-incrimination attaches. Once custody is established no interrogation whatsoever, even the routine or casual, is permitted unless a valid waiver of defendant's stated rights is demonstrated. Miranda v. Arizona, 384 U.S. at 444, 86 S.Ct. at 1612.

### OBJECTIVE TEST—PROBABLE CAUSE

 We are of the opinion that defendant was neither in custody nor was he deprived of his freedom in any significant way. Whether defendant is in custody is determined by an objective test, based on the evidence. Police testimony that the defendant is free to go is relevant but not controlling. Similarly, defendant's subjective belief that he is not free to go is only a factor worth considering. Custody must be determined by an analysis of the relevant circumstances with particular attention to probable cause gauged by the "reasonable man" test. In quoting from People v. Arnold, 66 Cal.2d 438, 58 Cal.Rptr. 115, 426 P. 2d 515 (1967), the U.S.Court of Appeals, 9th Circuit in *Lowe*, supra, said in determining custody:

> " * * * [t]he trial court should also consider the extent to which the authorities confronted defendant with evidence of her guilt, the pressures exerted to detain defendant, and any other circumstances which might have led defendant reasonably to believe that she could not leave freely." (407 F.2d at 1397)

The test is really one of two levels. The first inquiry must be into the existence of probable cause. Where it exists, it is presumed that the police will do their job and arrest. In State v. Thomas, 104 Ariz. 408, 454 P.2d 153 (1969), this Court said:

> "As our Court of Appeals indicated in State v. Tellez, 6 Ariz.App. 251, 431 P.2d 691 (1967), the warning must be given when the police have reasonable grounds to believe that a crime has been committed, and also reasonable grounds to believe that the defendant is the one who committed it. We approve of this position as being in accord with Miranda v. State of Arizona, supra." (104 Ariz. at 410, 454 P.2d at 155)

---

1. See generally, Sobel (Nathan R. Sobel, Justice of the Supreme Court, Kings County, New York), The New Confession Standards "Miranda v. Arizona" (1966, Gould Publications); Graham, What is "Custodial Interrogation?": California's Anticipatory Application of Miranda v. Arizona, 14 U.C.L.A.Rev. 59 (1966).

This standard gives the officer a clear and familiar line to follow. But a finding that no probable cause exists does not necessarily mean that there was no "custody" or that defendant was not "otherwise deprived of his freedom of action in any significant way." There exists, then, the second situation where the police detain someone on mere suspicion where no probable cause exists. In such cases detention constitutes custody where a reasonable innocent man under the relevant circumstances would believe he is not free to go. Lowe v. United States, supra; Hicks v. United States, 127 U.S.App.D.C. 209, 382 F.2d 158 (1967); see also People v. Yukl, 25 N.Y.2d 585, 307 N.Y.S.2d 857, 256 N.E.2d 172 (1969).

Relating this test to the facts, it is apparent that until the confession was made, there existed no probable cause. Until this confession, the police had as evidence a number of inconsistencies in the defendant's story. These were minor and could have been easily explained. These inconsistencies are well within the limits explicable by faulty memory or poor observation. In fact, it would be rare indeed, in a story repeated a number of times, to find no inconsistencies of some sort. Similarly, it is undisputed that at no time was defendant's freedom of action, before this last interrogation, significantly impaired; he was free to go at any time and, in fact, did. Thus, our main concern is with the last interrogation. Since this last interrogation revealed no additional evidence until the confession was made, there still existed no probable cause to arrest. In fact, the police could find no motive. There was no connection between the victim and the accused. The question remains whether defendant was deprived of his freedom, a kind of de facto arrest, even though no probable cause existed. Where no probable cause exists, a finding of "custodial interrogation" is obviously more difficult. It must be based, if at all, as we have stated, on an analysis of all the relevant facts gauged by the reasonable man test. Of special interest, though not controlling, is the belief of the defendant especially where he does not believe that he was in custody:

"Q Then it was your feeling at this time [the onset of the last interrogation] you were *not* in custody and you had a right to go, if you wanted to, is that right? [emphasis supplied]

A Yes [by defendant Mumbaugh]" (R.T. 191)

The surrounding circumstances substantiate this belief. Some discussion of the relevant facts is necessary. Although defendant strongly urges that the failure to use the tape recorders present in the room as evidence of an intent to arrest, this really is evidence that the police viewed this last interrogation as no different from the others where no recorders were used and defendant was free to go. In fact, if they were used in this instance and not in the others then this would be evidence of a change in police methods, attitudes and intent relevant to the question at hand. Furthermore, defendant voluntarily came to the station. The mere fact that he was requested to come is, of course, not determinative since an invitation might be couched in such terms as to be a de facto arrest, but it is a factor which we will consider to arrive at an accurate picture of the situation. It is also important to note that before the Miranda warnings were given, the police did not reveal to defendant their awareness of the inconsistencies with his story. These are important factors in determining whether a reasonable innocent man under the circumstances might believe he was free to go. The fact that a defendant was being interviewed in the police station does not necessarily change this. It is just one of the factors to be considered. While under *Miranda* we must view this fact suspiciously there is no rule that we must make police house interrogation a per se violation. Freije v. United States, 408 F.2d 100 (1 Cir. 1969); Hicks v. United States, supra;

United States v. Bird, 293 F.Supp. 1265 (D.C.1968).[2]

Nor are we unmindful of the fact, when we hold that defendant was not in custody, that he was interrogated on a number of different occasions. But an inspection of these questioning sessions reveals that even until the next to last interrogation, defendant was disclosing new and additional facts relevant to the investigation. In other words, each interview was not merely a repetition of the one prior to it, rather it covered new areas in what was a general investigation into the crime. Since defendant was their only source of leads it was necessary to exhaust his knowledge of the facts. *Miranda* itself recognized this need when it said:

"In announcing these principles, we are not unmindful of the burdens which law enforcement officials must bear, often under trying circumstances. We also fully recognize the obligation of all citizens to aid in enforcing the criminal laws. This Court, while protecting individual rights, has always given ample latitude to law enforcement agencies in the legitimate exercise of their duties. The limits we have placed on the interrogation process should not constitute an undue interference with a proper system of law enforcement. As we have noted, our decision does not in any way preclude police from carrying out their traditional investigatory functions." 384 U.S. at 481, 86 S.Ct. at 1631.

We believe that the police acted within these limits and we therefore hold that the facts are consistent with the test laid down in this case, that a reasonable innocent man under these circumstances would believe he was free to go.

### THE POLICE REPORT

■ Defendant contends that the Miranda Warnings were given immediately after the confession, not before, and that the

police report of the last interrogation was in error on this point and incomplete in that it omitted much of the interrogation. Defendant, though, makes no offer of proof as to what was missing nor whether this missing portion was in any way physically or psychologically coercive of a kind *Miranda* sought to avoid. Even if we accept defendant's view, that the confession was made before the Miranda Warnings were given—which we are not obliged to do—still the circumstances of the interrogation did not constitute a violation of *Miranda*. The reason for this is clear. Once the confession was made, probable cause arose for the first time and under the *Thomas* case the warnings must be given. This is the time defendant contends they were. Thus, under either version the warnings were timely given.

### MIRANDA'S "OUTSET OF INTER-ROGATION" REQUIREMENT

■ We also reject defendant's argument that *Miranda* required the warnings to be given at the outset of this last interrogation. *Miranda* requires the warnings to be given at the "outset of custodial interrogation" not at the outset of any interrogation. Since the defendant was not in custody at the outset of this last interrogation, no such requirement existed. If probable cause arises sometime after the interrogation begins, it is then, that the warnings must be given, for any questioning which commences after this point is considered the "outset of custodial interrogation."

### DEFENDANT WAS PROPERLY ADVISED OF HIS RIGHTS

■ We briefly turn to the question defendant raises as to whether he was properly advised of his rights. The Tempe Police advised him in this manner:

"Before we ask you any question, you must understand your rights. You have the right to remain silent. Anything you

---

2. See Sobel, New Confession Standards "Miranda v. Arizona", supra, note 1, who on page 62 distinguishes between those brought from the field to the station house and those who voluntarily come to the station for questioning; obviously the former is a stronger case for the per se rule.

say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any question, and to have him with you during questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court. If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you talk to a lawyer." (Appendix 6, pp. 38–39)

It must be noted that this case arose in September of 1966, only three months after the U. S. Supreme Court handed down *Miranda*. Yet even viewed by today's understanding of the Miranda rights, this statement complies with the dictates of the Supreme Court. The fact that police today use a different form is irrelevant. What is in issue is whether the words in the context used imparted a clear, understandable warning of all defendant's rights, and were in language the defendant could comprehend and on which he could intelligently act. We believe it complies with this.

### THE "HEAVY BURDEN"

 Lastly, defendant contends the state has failed to carry its "heavy burden" of proof, as required by *Miranda*, to show that he knowingly and intelligently waived the rights as given above.[3] *Miranda* said that "a valid waiver will not be presumed simply from the * * * fact that a confession was in fact eventually obtained." (384 U.S. at 475, 86 S.Ct. 1628). The trial court found that the government proved beyond a reasonable doubt a valid waiver. There was substantial evidence in the record to show this:

1. Defendant was timely and properly given his rights as herein held.

2. The police report showed after a reading of these rights defendant said, "I know these rights." (Appendix 7– page 25).

3. Defendant then signed a waiver form:

"I have read the statement of my rights shown above. I understand what my rights are. I am willing to answer questions and make a statement. I do not want a lawyer. I understand and know what I am doing. No promises or threats have been made to me and no pressure of any kind has been used against me.

Signed DAVID R. MUMBAUGH
9/29/66

| | |
|---|---|
| Witness | DALE DOUGLAS |
| Witness | BILL C. HILL |
| Time: | 8:57 PM" |

4. Defendant shortly after this confessed.

*Miranda* said that "an express statement that an individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver." (384 U.S. at 475, 86 S.Ct. at 1628.) There is no question but that the record showed full compliance with this. Where the trial court's factual finding on the subject is supported by substantial evidence, this court will not disturb its ruling. State v. Denton, 101 Ariz. 455, 420 P.2d 930 (1966); State v. Rubio, 95 Ariz. 1, 385 P.2d 1017 (1963).

Our holding that the confession was properly admitted thereby forecloses any inquiry into the admissibility of the knife and shirt which defendant contends is evidence derived from an illegal confession.

Affirmed.

STRUCKMEYER, C. J., HAYS, V. C. J., and LOCKWOOD and CAMERON, JJ., concur.

---

3. *Miranda* relied upon Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) in setting its "high standards of proof [upon the prosecution] for the waiver of constitutional rights." (384 U.S. at 475, 86 S.Ct. at 1628).