# THEODORE SCOTT WIENER *v.* STATE OF MARYLAND

[No. 90, September Term, 1980.]

*Decided June 9, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Claudia A. Cortese and George E. Burns, Jr., Assistant Public Defenders,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*F. Ford Loker, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

RODOWSKY, J., delivered the opinion of the Court.

Appellant, Theodore Scott Wiener (Wiener), was convicted at a court trial of first degree murder and first degree rape in a case removed from the Circuit Court for Anne Arundel County to the Circuit Court for Baltimore County. Consecutive life sentences were imposed. We issued the writ of certiorari prior to consideration of Wiener's appeal by the Court of Special Appeals.

Wiener claims a violation of the constitutional right to effective representation of counsel because of the activities in the office of Wiener's defense attorney, the District Public

Defender for Anne Arundel County, of an undercover agent engaged by the Office of the Attorney General of Maryland. We shall remand for a rehearing and redetermination of Wiener's motion raising that issue. Wiener also asserts that certain of his statements to the police were made during a "custodial interrogation" within the meaning of *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and that the State failed to inform him that it intended to use certain sex and violence magazines at his trial in violation of Md. Rules 741 and 772. These latter contentions are rejected.

The facts relevant to each of the appellant's arguments are presented in the discussion of the particular issue.

## I

By letter dated January 31, 1979 the Governor of Maryland, acting pursuant to Maryland Constitution Article V, § 3, authorized and directed the Attorney General to undertake immediately an investigation of allegations involving misuse of state services and personnel by the Public Defender for Anne Arundel County, T. Joseph Touhey, in his private practice of law. The letter further stated that "if criminal charges are brought" as a result of the investigation, the Attorney General was authorized to prosecute in any courts of this state "with the full powers and authority possessed by a State's Attorney." We were advised by Wiener's counsel at oral argument that no prosecution ever came about as a result of this investigation.

Mr. Touhey's private office was located on one floor of a building at 91 Aquahart Road in Glen Burnie and the District Public Defender's Office was located on another floor of the same building. In the course of the investigation it was determined to utilize an undercover agent. Subsequent discovery of this operation led to the filing by Wiener of a pretrial motion to dismiss the indictment and for appropriate relief. An evidentiary hearing was had at which Wiener called three witnesses: Nancy Lee Zinn, a secretary in the District Public Defender's Office; Smedley Clinton, the

investigator in that office; and Bruce C. Spizler, an assistant attorney general who instructed the undercover agent and to whom the latter reported. Based on the testimony and exhibits at the evidentiary hearing, the facts may be summarized as follows.[1]

In March 1979 there were three paid law student interns in the Anne Arundel County Public Defender's Office. As a result of a statewide directive dated March 6, 1979, they were terminated as of March 28, 1979 because of the lack of funds. On March 13, 1979 Assistant Attorney General Spizler met for the first time with Steven Vanderbosch, a law student who resided in Annapolis, Anne Arundel County. Vanderbosch agreed to assist in the investigation and was directed to seek employment in Touhey's private law office. If he were unsuccessful in that attempt, he was to seek employment as a paid law clerk in the Public Defender's Office and, if unsuccessful in that, then to volunteer as an uncompensated law clerk for the Public Defender. In any event, Vanderbosch's duties for the Attorney General's Office were to observe the day-to-day activities of Touhey's private office, including particularly the use of the xerox machine, postal meter and telephone lines, and any activities of a secretary, who was employed by the Office of the Public Defender, regarding Touhey's private practice of law. On March 26 Spizler learned that Vanderbosch was to start work, although it was not clear at that time whether this would be in the private law office or in the Public Defender's Office. On March 27, 1979 Vanderbosch started work, on a schedule of Tuesdays and Thursdays only, as a volunteer law clerk in the Public Defender's Office. By letter dated March 28, 1979 Spizler furnished Vanderbosch with directives prepared by the investigations unit of the Attorney General's Office regarding the "minimization of any

---

1. A motion by the Attorney General to intervene, supported by affidavits, was filed in the trial court. The motion was denied and the affidavits were not considered below. An answer by the State's Attorney for Anne Arundel County, containing averments of fact, was filed in opposition to Wiener's motion to dismiss. We have not considered either the Attorney General's motion and supporting affidavits or the answer to Wiener's motion, as setting forth facts in the record on this appeal.

intrusions into the attorney/client privilege." Vanderbosch was told that "[i]f at all possible, you may *not* and should *not*" read correspondence to or from a client, participate in any conferences or telephone conversations with clients or read any memoranda prepared by Touhey in the course of representing his "private" clients. (Emphasis in original.) The letter concluded by stating that "[i]f there should come a time when it is necessary to choose between observing privileged material and revealing your 'cover,' you are to contact me immediately for guidance."

The victim, Robin Lee Crawford, was murdered in the early afternoon of March 28, 1979. A warrant for appellant Wiener's arrest for that murder was obtained early in the morning of April 11, 1979. On instructions from Touhey, investigator Clinton interviewed Wiener at the Anne Arundel County Detention Center on April 12, 1979 and obtained a five-page written statement.

On Tuesday, April 17, Vanderbosch was sitting in the reception area of the Public Defender's suite. Tuesdays were the civil assignment day in the District.Court of Maryland sitting in Glen Burnie and Vanderbosch had no clients to interview. Clinton asked Vanderbosch to step into Clinton's office to discuss an unspecified matter. Clinton showed Vanderbosch the Wiener statement, which Vanderbosch read. There then ensued a conversation of some 10 to 15 minutes duration, concerning things which would probably be done in defense of the case and procedures which would probably be followed. Clinton later told Touhey everything which Vanderbosch had discussed with Clinton.

There is no evidence of any other contact by Vanderbosch with the Wiener case.

Spizler, who was called by Wiener's counsel at the hearing on the motion, testified under cross-examination by the State that Vanderbosch had no duties, functions or responsibilities for the Attorney General's Office which were involved with the function of the Public Defender's Office; that Vanderbosch was not asked to report back in any way concerning any activities of the Public Defender's Office

involving their clients and the criminal cases that they were involved in, and that it was not until April 30 that Spizler first learned of the allegations involving the Wiener motion and, indeed, of the Wiener case. Spizler testified that at no time did Vanderbosch, either in written reports or orally, discuss anything regarding the Wiener case and that Vanderbosch has never "divulged, hinted, [or] in any way informed [Spizler] of any information that [Vanderbosch] may have obtained or elicited regarding the Wiener case while he was an employee of the Office of the Public Defender."

The trial court denied Wiener's motion. In an oral opinion from the bench it concluded that "[t]here is absolutely nothing before the Court that there was any compromise of this information."

It is clear that the statement which Wiener gave to investigator Clinton was a communication between Wiener and his counsel. *People v. Knippenberg,* 66 Ill. 2d 276, 6 Ill. Dec. 46, 362 N.E.2d 681 (1977). Whether the State's intrusion, through Vanderbosch, into the relationship between Wiener and his attorney results in dismissal of the indictment, as Wiener requests, is controlled by principles set forth in recent decisions of the Supreme Court.

*Weatherford v. Bursey,* 429 U.S. 545, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977) was a civil action under 42 U.S.C. § 1983 against Weatherford, a state undercover agent. Bursey, Weatherford and others had vandalized Selective Service offices. Bursey retained counsel for himself. Weatherford participated in meetings concerning defense strategy between Bursey and his counsel, at their invitation. The district court found that Weatherford did not disclose his role in order to preserve his cover but that Weatherford did not pass on to his superiors in the law enforcement agency or to the prosecuting attorney any information having to do with the criminal action pending against Bursey. At the criminal trial Weatherford testified as to his undercover activities and gave an eyewitness account of the vandalism. Bursey was convicted. In the § 1983 action the district court found against Bursey but the Fourth Circuit reversed. That court

held that whenever the prosecution knowingly arranged or permitted an intrusion into the attorney/client relationship it sufficiently endangered the right to counsel to require reversal and a new trial. Under this approach it was immaterial that the agent had not informed other officials about the content of the meetings between the attorney and his client. This *per se* rule was rejected by the Supreme Court. It recognized the argument that a dutiful agent would surely communicate to the prosecutors defense plans and strategies but noted that the argument foundered on the express findings by the trial court that Weatherford had communicated nothing about the meetings. The Supreme Court pointed out that the case did not present a situation where the state's purpose was to learn what it could about legal defense plans. It reasoned that the *per se* rule would require the informant to refuse to participate in attorney-client meetings, even though invited, and thereby for all practical purposes unmask himself, although the Court had previously recognized the unfortunate necessity of undercover work in law enforcement. The Court concluded by holding:

> [U]nless Weatherford communicated the substance of the [attorney-client] conversations and thereby created at least a realistic possibility of injury to Bursey or benefit to the State, there can be no Sixth Amendment violation . . . .
>
> There being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion by Weatherford, there was no violation of the Sixth Amendment. . . . [429 U.S. at 558, 97 S. Ct. at 845, 51 L. Ed. 2d at 41.]

In the present case Wiener predicated his argument on a distinction of *Weatherford* which was made by the Third Circuit in *United States v. Morrison,* 602 F.2d 529 (1979). There the defendant was awaiting trial on distribution of heroin charges, as to which she had retained private counsel. Agents of the Drug Enforcement Agency attempted to obtain her cooperation in a related investigation without the knowledge or permission of her counsel. The agents

disparaged her counsel and suggested she could be better represented by the public defender. At no time did the defendant incriminate herself or supply any information pertinent to her case. The Third Circuit reversed the conviction and dismissed the indictment for violation of the sixth amendment. *Weatherford* was said to apply only when there was neither prejudice to the defendant's case nor any wrongfully motivated intrusion into the attorney-client relationship. Where, however, there was a deliberate attempt to interfere with that relationship, the Third Circuit applied a test which considered the purpose of the interference (Was it wrongfully motivated?), the propriety of the interference (Was it inadequately justified?) and the effect of the interference on the relationship.

After argument of Wiener's appeal, the Supreme Court reversed and remanded this Third Circuit decision. *United States v. Morrison,* 449 U.S. 361, 101 S. Ct. 665, 66 L. Ed. 2d 564 (1981). We set forth the heart of the rationale.

> Our approach has thus been to identify and then neutralize the taint by tailoring suitable relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial. The premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense. Absent such impact on the criminal proceeding, however, there is no basis for imposing a remedy in that proceeding, which can go forward with full recognition of the defendant's right to counsel and to a fair trial.

> More particularly, absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate. This has been the result reached where a Fifth Amendment violation has occurred, and we have not suggested that searches and seizures contrary to the Fourth

Amendment warrant dismissal of the indictment. The remedy in the criminal proceeding is limited to denying the prosecution the fruits of its transgression.

Here, respondent has demonstrated no prejudice of any kind, either transitory or permanent, to the ability of her counsel to provide adequate representation in these criminal proceedings. There is no effect of a constitutional dimension which needs to be purged to make certain that respondent has been effectively represented and not unfairly convicted. The Sixth Amendment violation, if any, accordingly provides no justification for interfering with the criminal proceedings against respondent Morrison, much less the drastic relief granted by the Court of Appeals. [*Id.* at 101 S. Ct. at 668-69, 66 L. Ed. 2d at 568-69 (footnotes omitted).]

In the instant appeal the relief which Wiener seeks is dismissal of the indictment. If demonstrable prejudice, or the substantial threat thereof, is absent, dismissal is inappropriate even if the violation was deliberate. Indeed, absent at least a realistic possibility of injury to the accused or benefit to the State, there can be no sixth amendment violation. It is also clear that the ultimate risk of non-persuasion as to presence of prejudice is on the accused, as the moving party on the motion to dismiss. However, as in the proof of any other fact, direct evidence of prejudice is not required. Once an agent of the State has surreptitiously invaded the relationship between an accused and his attorney, the accused is not limited to proving a sixth amendment violation by extracting from the undercover agent, his law enforcement principals or the prosecutors, admissions that communications between the accused and his attorney have been passed on by the informant. Depending upon the facts directly established by the evidence, prejudice may properly be inferred. *Weatherford* acknowledges this possibility. After reviewing the absence from that case of elements involving the use by the prosecution of conversations be-

tween the accused and his counsel which were overheard by the undercover agent, or even knowledge by the prosecution of the details of those conversations about trial preparations, the Supreme Court said:

> Nevertheless, it might be argued that Weatherford, a dutiful agent, surely communicated to the prosecutors Bursey's defense plans and strategy and his attorney's efforts to prepare for trial, all of which was inherently detrimental to Bursey, unfairly advantaged the prosecution, and threatened to subvert the adversary system of criminal justice. [429 U.S. at 555-56, 97 S. Ct. at 844, 51 L. Ed. 2d at 40.]

Because the trial court in *Weatherford* had found that there was no communication by the undercover agent of confidential information, that argument, which is based on inference, foundered at the Supreme Court level. At the same time, the Supreme Court rejected, as cutting much too broadly, a legal rule of *per se* sixth amendment violation based on intrusion alone so that the rule would operate in the face of a fact finding that there had been no communication. The Supreme Court has not been called upon to draw a line between its rejection of a rule of automatic violation and a sixth amendment violation established by inference from the direct evidence. The gray area involves the quantum of proof beyond the intrusion itself which is sufficient to establish a violation which is to be remedied in some way.

In this case, Wiener demonstrated that Vanderbosch was engaged by the investigative section of the Attorney General's Office. The Attorney General is the legal advisor to the State's Attorneys and is counsel for the prosecution in criminal appeals. In the Touhey investigation the Attorney General was also empowered, in essence, to act as a State's Attorney. Here, where Wiener's right to a fair trial is implicated and the integrity of Wiener's defense by the Public Defender system is put in question, we do not see so great a distinction between the Attorney General and the State's

Attorney for Anne Arundel County as to insulate Vanderbosch from being an agent for the State in its general function as prosecutor.

Wiener also proved that Vanderbosch, while masquerading as a member of the staff of Wiener's attorney, became privy to one of the most confidential of the communications between an accused and his attorney, the statement of the accused concerning the charges against him. Whether Vanderbosch disclosed that information would principally, if not exclusively, be known by him, by his superiors in the Attorney General's Office, and by the prosecutorial team on the Wiener case. These facts shown by Wiener could give rise to an inference of disclosure by the "dutiful agent." At that stage of the hearing the burden of persuasion effectively shifted to the State to convince the trier of fact that the information obtained as a result of Vanderbosch's intrusion was not communicated by Vanderbosch. But Vanderbosch was not called as a witness. No police officer responsible for the murder investigation testified. There was no witness from the State's Attorney Office. Spizler, on cross-examination by the State, testified that there was no communication from Vanderbosch to him concerning the Wiener case. Spizler, of course, could not testify one way or the other as to whether Vanderbosch communicated with the prosecution team.

The record in this case is not sufficiently clear to permit an appellate determination that the trial court made a finding of fact consistent with the foregoing analysis. Its ruling was that "[t]here is absolutely nothing before the Court that there was any compromise of this information." This ruling is not phrased as a finding that no information obtained from Wiener was in fact communicated by Vanderbosch. It is a description of the state of the evidence. We are unable to discern whether the trial court was viewing the burden to be at all times on Wiener or whether the trial court recognized that the burden of persuading it that no disclosure had been made had shifted to the State, so that the trial court was articulating a finding, based on all

of the evidence and the legitimate inferences therefrom, that there had been no communication.

Further, Wiener produced evidence that Vanderbosch, the only law student clerk or intern then on the District Public Defender's staff, made suggestions to Clinton, a non-lawyer, relating to Wiener's defense which Clinton relayed to Touhey. This is unlike the undercover agent in *Weatherford* who sat by invitation in a defense conference, but who merely said he intended to seek a severance of the trial of his own charges. Here an agent of the State, acting as a member of the defense counsel's team, affirmatively contributed to preliminary defense analysis. The trial court made no finding on the presence or absence of detriment to Wiener or benefit to the State resulting therefrom.

For these reasons, "the purposes of justice will be advanced by permitting further proceedings in the cause . . . ." Md. Rule 871 a.[2] In *Gill v. State,* 265 Md. 350, 289 A.2d 575 (1972) we addressed the use of Rule 1071 a, the companion of Rule 871 a, to effect a limited remand in a criminal case. The Court of Special Appeals had remanded a non-jury case for a redetermination of the voluntariness of a confession. We assumed that Rule 1071 a could be invoked in criminal causes and commented that "it may be suitable to correct procedures subsidiary to the criminal trial . . . ." But we held that a restricted remand "can never be utilized to rectify prejudicial errors committed during the trial itself" and that the "admissibility of a confession is always an

---

2. Rule 871 a in pertinent part provides:
If it shall appear to this Court . . . that the purposes of justice will be advanced by permitting further proceedings in the cause . . . then this Court, instead of entering a final order affirming, reversing or modifying the judgment from which the appeal was taken, may order the case to be remanded to the appropriate court. Upon remand to the appropriate court, such further proceedings shall be had . . . as may be necessary for determining the action upon its merits as if no appeal had been taken and the judgment from which the appeal was taken had not been entered; provided, however, the order entered by this Court in remanding said case, and the opinion of this Court on which said order is passed, shall be conclusive as to the points finally decided thereby. In such an order remanding a case, this Court will express the purpose for so remanding and in its opinion filed with said order will determine all questions which may have been properly presented.

integral part of a trial." *Id.* at 357, 289 A.2d at 579. Here, the hearing to determine the facts underlying Wiener's motion claiming denial of the right to the effective assistance of counsel was collateral to the criminal trial itself. Unlike the issue relating to the voluntariness of the confession in *Gill,* evidence given in support of, or in opposition to, Wiener's motion to dismiss is not presented again in the course of the trial for consideration with all of the evidence bearing on guilt or innocence. Wiener's non-jury case presents the type of an issue which meets the criteria suggested in *Gill* for a limited remand in a criminal case and we hold that Rule 871 a may be applied.

Thus, we shall neither affirm nor reverse the judgment of conviction from which this appeal was taken, but the matter will be remanded for the limited purpose of conducting a new hearing on the issue of the claimed violation of the right to counsel. At this hearing additional evidence may be presented by Wiener and by the State. This may include evidence directed to demonstrating and negating prejudice arising from Vanderbosch's receipt of information in Wiener's statement, from defense suggestions made by Vanderbosch, or otherwise. The trial court should thereafter make specific findings of fact in support of its ruling.

If the trial court concludes on the restricted remand that there has been no prejudice in fact resulting to Wiener from the intrusion, then the motion to dismiss should be denied. If the trial court concludes that prejudice has resulted, then the approach should be to "neutralize the taint by tailoring suitable relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial." *United States v. Morrison, supra,* 449 U.S. at 365, 101 S. Ct. at 668, 66 L. Ed. 2d at 568. Even if the trial court should find that Wiener was prejudiced by Vanderbosch's intrusion, dismissal would appear unwarranted. Full recognition of Wiener's right to counsel and to a fair trial could be afforded, in that event, by a new trial for which the trial court shall appoint, an "assistant counsel for the State" to handle the prosecution. Md. Code (1974, 1980 Repl. Vol.), § 2-102 of the Courts and Judicial

Proceedings Article. In that event, such a special prosecutor is to be an attorney from private practice who had and has no exposure to any of Wiener's communications to his counsel.

Because Wiener's other contentions look to a new trial in any event, we now address them.

## II

A two-day hearing was held on Wiener's motion to suppress oral and written statements which he had given to the police. The thrust of Wiener's testimony, which the trial court was not required to believe, was that no *Miranda* warnings were given prior to his oral incriminating statements. From all of the evidence the trial court could have found the following circumstances leading up to the statements.

At about 3:00 p.m. on March 28, 1979 the corpse of Robin Crawford, a 20-year-old female, was found by her female roommate. The victim had been stabbed to death in the bedroom of her home in northern Anne Arundel County. Inquiries developed that at 2:00 a.m. that date Robin Crawford had left the Holiday Inn in Glen Burnie with four men, David Knight, Dennis Hammond, Nick Greenberg, an owner of Vizzini's Italian Carry Out, and Wiener, an employee at Vizzini's. Wiener was 19 years of age and is a high school graduate. The group had gone to Robin Crawford's home and smoked some marijuana. The men left in the early morning hours. On the evening of that same day Detective Bonnie Lowe went to Vizzini's and conducted preliminary field interviews of Wiener and Greenberg. Wiener expressed his willingness to give a written statement at a later time at police headquarters in Millersville.

At about 1:30 p.m. on March 29 Wiener received at Vizzini's by telephone the request from the police to give such a statement but he said he had no transportation because his motorcycle had broken down. The caller offered to furnish transportation. Shortly thereafter Detective Lowe

came to the pizza shop and drove Wiener to the Millersville station. Wiener waited in a hallway at the station with three other persons who were to be interviewed in the investigation, at least two of whom were from the group who had been at the victim's home early in the morning of the preceding day. *Miranda* warnings were given to each of the four and Wiener signed a written waiver at 3:57 p.m. About 5:00 p.m. Wiener was called into an interview room and gave a three-page, non-incriminating statement to Detective Mock. Wiener's statement was generally consistent with those of the other young men who had been with the victim early in the morning on the day of the murder. Wiener said that after leaving Robin Crawford's early in the morning of the 28th he had gone to bed (at the home of his friend, Donnie Kemp) and that he had been awakened about 1:00 p.m. on the 28th by a telephone call from a Lisa Stimson. He had then gone to a florist shop in Glen Burnie where he left his motorcycle, because of motor trouble, and had been driven by Donnie Kemp to work at Vizzini's where he arrived at about 2:00 or 2:15 p.m. Wiener agreed to a polygraph examination, the results of which were not noteworthy. He furnished his fingerprints and a hair sample, as did the other three men interviewed. Detective Mock noticed some red spots on Wiener's shoes, and asked if Wiener would leave the shoes for analysis, to which Wiener agreed. The spots were pizza sauce. Wiener left the station about 8:00 or 8:30 p.m.

At the outset of the investigation, 17 detectives were assigned to the Crawford case. The police developed a list of over 40 persons who were associates of the victim and who had to be interviewed.

Donnie Kemp, Wiener's best friend, had been asked by the police to come by the Millersville station and give a statement. The purpose was to verify Wiener's statement. On April 2, in the early afternoon, Kemp stopped by the Millersville station on his way to go fishing. He left Wiener and two others in his four-wheel drive parked outside the building. Detective Thrift, who was assigned to interview Kemp, reported to Sergeant William Chaplin and to Mock that Kemp was hostile and evasive concerning the times of

day and routes traveled when Kemp had been with Wiener on the early afternoon of March 28. Kemp advised that Wiener was waiting outside the station house. Mock asked Wiener to come into the building. It was Mock's object to see if Thrift's interview of Kemp would develop in such a way that Wiener might be able to obtain Kemp's cooperation. Mock and Wiener waited, sitting at a table in the auditorium in the basement of the police building. They had a conversation which Wiener describes as being "general background." The conversation was taped with Wiener's consent. Wiener's account of his whereabouts after leaving Donnie Kemp's house and prior to arriving at the pizza shop in the early afternoon of March 28, involved, in Mock's opinion, more time than was required for the distance traveled, even on a malfunctioning motorcycle. Mock therefore asked Wiener if he would take another polygraph examination, to which Wiener consented. Mock wanted to see if there was any "deception." The test was unremarkable. Meanwhile, Detective Thrift had obtained a statement from Kemp who had left the Millersville station. The police furnished transportation for Wiener back to Vizzini's. Wiener left the station about 9:00 p.m. on the 2nd. In his conversation with Mock, Wiener had told Mock not to hesitate to call upon him and that he would help in any way he could.

After Wiener had been interviewed on April 2, and pursuant to a telephone call which Wiener, at Mock's request, had made to Lisa Stimson from the station, Mock spoke to Lisa Stimson. She placed her March 28 telephone call to Wiener at Kemp's house as having been made between 12:00 and 12:30 p.m.

During this period the police were engaged in verifying the times given by other acquaintances of the victim and were attempting to narrow the list of possible suspects by eliminating individuals. On April 6 the police learned from the FBI laboratory that a palm print, which could not be identified, had been found on the headboard of the bed on which the victim's body was found.

The next contact between Wiener and the police was on the evening of April 8. Detective Mock had received informa-

tion that Wiener had changed his address. Mock and Detective Warner, who died prior to the suppression hearing, went to the pizza shop and waited outside, in Mock's words, "forever" until Wiener left. It was obvious that Mock was following Wiener. Wiener returned to the parking lot behind the pizza parlor. Mock and Warner approached Wiener and asked him for his address. In the course of this conversation Mock says Warner picked a bug off of Wiener's jacket and later gave Mock some fibers from the jacket which Warner had obtained in that contact. Wiener says Mock was the one who picked the bug, if any there were, off of his jacket. No contention is made that the fibers were used in evidence, or led to any evidence.

A day or two before April 10 the police were advised that the fingerprints which had been taken from Wiener on March 29 had not produced a set which was useful for comparison purposes. By April 10 the investigative force on the Crawford case had been reduced to four detectives, in addition to Sergeant Chaplin and a lieutenant. There were still many persons to interview and the officers had been working 16 to 18 hours a day. Chaplin and Mock, on the evening of April 10, were reviewing the case. Realizing that they had to get a clear and full set of fingerprints from Wiener, they went, between 7:00 and 7:30 p.m., to the rooming house where Wiener was living. Wiener stated he would be willing to furnish another set of prints but he was unable to say when he could come by the police station because he had no transportation. When Wiener told the officers that he had no engagements that evening, they offered to take him to the station that evening and Wiener agreed. After the fingerprinting was completed between 8:15 and 9:00 p.m. Mock, accompanied by Wiener, went off to find Chaplin in order to take Wiener home. They found Chaplin in the crimes against property section, where he was engaged in conversation. Chaplin testified he was going over a list of suspects in the Crawford case. Mock testified that Mock's analysis led him to consider Nick Greenberg as the principal suspect. While waiting for Chaplin to finish his conversation Mock told Wiener that Lisa Stimson had not

confirmed Wiener's recollection of the time of her telephone call to him and Wiener acknowledged that he was aware of the discrepancy in the two statements. Mock said that the Sergeant would want the details of Wiener's activities between 12:30 and 2:00 p.m. on March 28 fully developed and asked if Wiener would be willing to review this again while they were waiting for Sergeant Chaplin. Wiener agreed and the two went into an interview room in the crimes against property section. Wiener states that the door was open. Mock states, and Wiener confirms, that Mock had developed a good relationship or rapport with Wiener. Mock engaged Wiener in conversation about Wiener's life in Texas, about girlfriends Wiener had known and about problems he had had with women. Whenever the conversation got around to the events of the early afternoon of March 28, Wiener shied away from the subject. Mock says his interview technique is one of patience and that when Wiener would not stick to the point, he did not want to ruin the rapport. He did not want to "come down on" Wiener on the issue of times but he let Wiener control "his situation at his own momentum." There is no evidence that Mock expressly told Wiener that Wiener was free to leave if he chose, but Mock testified he repeatedly thanked Wiener for his cooperation in continuing to review the matter with Mock.

After 11:00 p.m. Sergeant Chaplin entered the room and listened to the interview. Wiener told the officers that his probation and parole officer had told Wiener not to talk to the police without an attorney, but Wiener said he wanted to do anything he could to help. At one point Mock asked Wiener if he had homosexual tendencies, which Wiener denied. The conversation got around to whether Wiener used hard drugs, which Wiener denied. It was Mock's recollection that Sergeant Chaplin became upset and suggested that Wiener was unable to account for his movements because he either had been on hard drugs or he was being deliberately evasive. Chaplin's recollection is that he only became upset at the information that a probation officer had recommended that Wiener not cooperate. In any event, at about this point, Mock and Chaplin had a conversation in the hall. They

decided to advise Wiener of his *Miranda* rights and if Wiener decided that he wanted to leave, then the police would furnish transportation wherever Wiener wanted to go.

Sergeant Chaplin then read Wiener a statement of *Miranda* rights and Detective Mock paraphrased and explained each sentence of the form. Wiener signed the waiver at 12:05 a.m. on April 11, 1979. Sergeant Chaplin left and Mock continued the interview. Unknown to Wiener, Mock switched on a small tape recorder which Mock had in his pocket. Wiener began retelling his story when Mock interrupted and unexpectedly asked whether, when Wiener went back to Robin Crawford's house on the afternoon of the 28th, he had knocked on the door or whether Miss Crawford had seen him coming and just opened it. Wiener said he had knocked on the door and Robin Crawford had answered. Wiener's oral statement then went through a phase in which he admitted being downstairs in the victim's home but denied having gone upstairs. He then admitted that he had gone upstairs and then admitted that he had raped and stabbed Miss Crawford.

Mock, accompanied by Wiener, then left the interview room and went in search of Sergeant Chaplin in the crimes against persons section. Detective Moore, who could type, was obtained to take a written statement which commenced at 1:45 a.m. with a further administering of *Miranda* cautions. Upon completion of the 14-page statement, an arrest warrant was obtained and Wiener was taken before a commissioner about 5:40 a.m.

The trial court concluded from all of the evidence that Wiener was "free to go," and that his rights against self-incrimination had validly been waived. On this appeal Wiener takes the position that a reasonable person in his situation would not have felt free to break off police questioning and that the entire interrogation was "custodial."

Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of freedom of action in any significant way." *Miranda v. Arizona, supra,* 384 U.S. at 444,

86 S. Ct. at 1612, 16 L. Ed. 2d at 706 (footnote omitted). The test was further explained by a *per curiam* opinion in a case in which the defendant came voluntarily to the police station, was immediately informed he was not under arrest, gave a one-half hour interview and then left, where the Supreme Court said:

> Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited. [*Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S. Ct. 711, 714, 50 L. Ed. 2d 714, 719 (1977) (emphasis in text).]

This Court has recently reviewed the cases and concluded that whether there is custody within the meaning of *Miranda* depends on the factual setting surrounding the interrogation in each case and that "some actual indication of custody must exist, such that a reasonable person would feel that he was not free to leave and break off police questioning." *Whitfield v. State,* 287 Md. 124, 141, 411 A.2d 415, 425, *cert. dismissed,* 446 U.S. 993, 100 S. Ct. 2980, 64 L. Ed. 2d 850 (1980).

Here, the record fully supports the finding of the trial court. Wiener was not under arrest. He came to the police station at the request of the officers, but this was because it was convenient at that time for him to do so and not because the request was imperative. His willingness to come was also consistent with the posture which he maintained of desiring to assist in the investigation. He traveled in the police car as a matter of accommodation. There was no questioning within the confines of the police car. The purpose of the trip to headquarters was to obtain clearer fingerprints, which Wiener was willing to give, and not interrogation. The interview seems to have evolved out of the circumstances of the wait for Sergeant Chaplin to finish his conversation and a mutual recognition on the part of Detective Mock and Wiener that Wiener's statement had to be fleshed out more precisely. There were no guards and the door of the interview room was open. It was Detective Mock who conducted the bulk of the interview, with Sergeant Chaplin present for only a portion of the time. While the interview did not commence until between 8:15 and 9:00 p.m., this was within the usual working hours for Wiener. Wiener had been advised 12 days earlier of his right to remain silent and to obtain counsel. Indeed, he had been cautioned by his probation officer not to speak with the police, but he chose not to follow that advice. The tone of the interview was neither harsh nor accusatory. It seems principally to have been a narrative by Wiener without obvious effort on the part of Mock to confine the conversation to the points relevant to Mock's interest. Under Mock's evidence, as soon as the interview began to take on the tone of the "friendly-unfriendly" or "Mutt and Jeff" act, the *Miranda* warnings were given. *See State v. Cassell,* 602 P.2d 410 (Alaska 1979). Mock's expressions of appreciation for Wiener's cooperation certainly indicated just that, namely that the interview was proceeding because of Wiener's cooperation and not because he was effectively in custody.

Citing *Cummings v. State,* 27 Md. App. 361, 341 A.2d 294, *cert. denied,* 276 Md. 740 (1975), Wiener recognizes that "investigative focus" is irrelevant and that the fact that the

questioning took place in a police station is not alone determinative. He contends, however, that in light of the request for his shoes, the second polygraph examination, the surveillance on April 8 and the taking of the fibers, he was being questioned as a suspect on April 10. He argues that his inability fully to account for his whereabouts at the time of the murder should be treated as a partial confession so that the interview of April 10 required *Miranda* warnings to be given at its inception. We disagree. In *Fisher v. Scafati,* 439 F.2d 307 (1st Cir.), *stay vacated* and *cert. denied,* 403 U.S. 939, 91 S. Ct. 2256, 29 L. Ed. 2d 719 (1971) the person ultimately convicted of a murder had claimed on initial interview that he had at all relevant times been at a party at which the victim had last been seen alive. The police subsequently obtained information that the defendant had left the party for about one hour. He was requested to come to the police station for reinterview. The district court had taken the view that the entire reinterview was custodial, but the First Circuit disagreed on that issue, saying that "[i]n view of the general breadth of the investigation the district court points to no reason for defendant to have attached particular significance to his being requested to return, or for believing forthwith that he was in custody." *Id.* at 310.

Applicable here is the analysis of the Supreme Court of Arizona in *State v. Mumbaugh,* 107 Ariz. 589, 595, 491 P.2d 443, 449 (1971) (in banc) where it said:

[I]t is apparent that until the confession was made, there existed no probable cause. Until this confession, the police had as evidence a number of inconsistencies in the defendant's story. These were minor and could have been easily explained. These inconsistencies are well within the limits explicable by faulty memory or poor observation. In fact, it would be rare indeed, in a story repeated a number of times, to find no inconsistencies of some sort. Similarly, it is undisputed that at no time was defendant's freedom of action, before this last interrogation, significantly impaired; he was free to go

at any time and, in fact, did. Thus, our main concern is with the last interrogation. Since this last interrogation revealed no additional evidence until the confession was made, there still existed no probable cause to arrest. . . . The question remains whether defendant was deprived of his freedom, a kind of de facto arrest, even though no probable cause existed. Where no probable cause exists, a finding of "custodial interrogation" is obviously more difficult. It must be based, if at all, as we have stated, on an analysis of all the relevant facts gauged by the reasonable man test.

Under all of the circumstances we cannot conclude that a reasonable person in Wiener's position would have felt that he was not free to leave and break off the police questioning.

### III

Wiener further submits that he is entitled to a new trial, or a new sentencing hearing, because Md. Rules relating to the furnishing of information by the State to the defense were violated. The contentions are prompted by what transpired in the course of cross-examination of the defense psychiatrist at the sentencing phase of this capital case in which the State had served notice that it was seeking the death penalty pursuant to Md. Code (1957, 1976 Repl. Vol., 1980 Cum. Supp.), Art. 27, § 412 (b).

No testimony was produced by Wiener at the trial of guilt or innocence on March 12-14, 1980. At the sentencing phase on March 17, 1980 Wiener called a psychiatrist who gave evidence relevant to the mitigating factor under Art. 27, § 413 (g) (4) that "the capacity of the defendant . . . to conform his conduct to the requirements of law was substantially impaired as a result of mental incapacity, mental disorder [or] emotional disturbance . . . ." On cross-examination the psychiatrist was shown magazines, apparently obtained in a consensual search of Wiener's living quarters, the covers of each of which depicted a young

woman being attacked by a man with a knife.[3] Defense counsel objected on grounds limited to relevancy and lack of foundation as to source. The objection was overruled. The psychiatrist, after stating that the magazines were "new data," testified:

> Well, it has several impacts. One impact is that I am getting increasingly annoyed with Mr. Wiener for not telling me about this, because I, with this as a lever I might have been able to uncork him a little further and find out more profoundly about his disturbance. And then I might have been able to introduce something earlier on in the trial. That is to say, it tends to make me think he is a bit crazier than I have estimated him at, even with all my best skills. It certainly is commensurate with the diagnoses that are present now, that is, schizoid personality, sexual deviation, sociopathic tendencies, etc.

There was no request by the defense for an opportunity further to consult with the psychiatrist. There was no defense proffer that the magazines had in fact caused a reversal of the psychiatrist's opinion expressed at the sentencing hearing that Wiener "clearly did not meet" the test for lack of responsibility for criminal conduct based on insanity as set forth in Md. Code (1957, 1979 Repl. Vol.), Art. 59, § 25 (a). There was no motion for a new trial.

On this appeal Wiener for the first time asserts that the State breached Md. Rule 741 by failing to disclose the magazines.[4] He says that this deprived him of all beneficial

---

**3.** Wiener had slashed Robin Crawford's throat to near decapitation and stabbed her in the torso 101 times.

**4.** Md. Rule 741 a 1 provides:

  a. *Disclosure Without Request.*

  Without the necessity of a request by the defendant, the State's Attorney shall furnish to the defendant:

    1. Any material or information within his possession or control which tends to negate the guilt of the defendant as to the offense charged or would tend to reduce his punishment therefor.

use of the information elicited on cross-examination, that it severely handicapped his defense and that he should be granted a new trial.

The alleged non-disclosure was known prior to the imposition of sentence. No objection or request was made to the trial court predicated on a violation of Rule 741. The point has not been preserved for appellate review. Md. Rule 813 b 1.

Utilizing the same incident on cross-examination, it is also contended that Rule 772 c 1 was violated,[5] so that a new sentencing hearing is required. Even if we were to assume applicability and a violation of this rule, the error was harmless beyond a reasonable doubt. At the sentencing

---

The State's "Disclosure Without Request," filed June 11, 1979, offered to permit inspection "at any time with prior arrangements" of any items seized in the search of Wiener's premises.

Md. Rule 741 b 5 provides:

b. *Discovery by the Defendant.*
Upon the request of the defendant, the State shall:

. . .

5. Evidence for Use at Trial.

Produce and permit the defendant to inspect and copy any books, papers, documents, recordings, or photographs which the State intends to use at the hearing or trial, and produce and permit the defendant to inspect and photograph any tangible objects which the State intends to use at a hearing or trial.

In its answer filed June 11, 1979 to Wiener's motion invoking this rule, the State said that the books and papers which it intended to use at trial would be made available to the defense at a time arranged to the mutual convenience of all parties.

5. Md. Rule 772 c 1 provides:

c. *Presentence Disclosures by the State's Attorney.*

Sufficiently before the imposition of sentence to afford the defendant a reasonable opportunity to investigate the information, the State's Attorney shall disclose to the defendant or his counsel:

1. Any information which the State expects to present to the court for consideration in sentencing . . . .

hearing there were only two choices open under Art. 27, § 413, the death penalty or a life sentence. Wiener received the lesser sentence.

> *Case remanded, without affirmance or reversal, to the Circuit Court for Baltimore County for the purpose of rehearing and redetermining, in accordance with the procedures set forth in the foregoing opinion, the motion by Theodore Scott Wiener asserting violation of the constitutional right to the effective representation of counsel.*
>
> *The judgment of conviction remains in effect.*
>
> *Costs in the Circuit Court for Baltimore County and in this Court to abide the result.*