577 A.2d 58

**James Lance WEBBER**

**v.**

**STATE of Maryland.**

**No. 168, Sept. Term, 1989.**

Court of Appeals of Maryland.

Aug. 1, 1990.

· Lawrence V. Kelly (Friend and Kelly, on brief), Cumberland, for appellant.

Jillyn K. Schulze, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, McAULIFFE and CHASANOW, JJ., and THEODORE G. BLOOM, Judge of the Court of Special Appeals of Maryland, Specially Assigned.

THEODORE G. BLOOM, Judge, Specially Assigned.

By Chapter 454 of the Laws of 1978 the General Assembly of Maryland added Section 388A to Article 27 of the Maryland Code (Crimes and Punishments), creating a new criminal offense known as "Homicide by motor vehicle while intoxicated." Subsection (a) of the statute declares that "intoxicated has the same meaning and is subject to the same presumptions and evidentiary rules of § 10–307 of the Courts Article regarding intoxication under the vehicle laws of this State." Subsection (b) provides:

> Any person causing the death of another as the result of the person's negligent driving, operation or control of a motor vehicle while intoxicated is guilty of a misdemeanor to be known as "homicide by motor vehicle while intoxicated," and the person so convicted shall be punished by imprisonment for not more than 3 years, or by fine of not more than $1,000 or both fine and imprisonment.

In a non-jury trial in the Circuit Court for Allegany County, James Lance Webber was convicted of violating that statute. Sentenced to a one year term of imprisonment with all but 30 days suspended, fined $500, and placed on probation for 5 years upon release from incarceration, Webber appealed his conviction to the Court of Special Appeals. This Court issued a writ of certiorari before argument in the intermediate appellate court.

# I

About ten minutes before midnight on Sunday, 28 August 1988, Webber was driving his Nissan Pathfinder automobile easterly on Main Street, U.S. Route 40, in Frostburg, Maryland, when his vehicle struck and fatally injured a pedestrian.[1]

---

1. When struck by Webber's vehicle, the pedestrian was thrown some distance east of the point of impact and toward Webber's left, falling to the street, sprawled across the center line. She was then run over by another eastbound vehicle that was close behind Webber. The

When interviewed by the investigating police officers at the scene, Webber admitted that he drove the vehicle, that he was drunk, and that he struck the pedestrian. He declined to perform a field sobriety test and to take a chemical test for alcohol. At 3:08 a.m., however, Webber was taken to the hospital where a blood sample was drawn. Chemical analysis disclosed a .23 percent blood alcohol level; the victim, according to the autopsy, had a blood alcohol level of .16 percent.

A criminal information charging Webber with homicide by motor vehicle while intoxicated was filed in the Circuit Court for Allegany County. Motor vehicle citations charging Webber with driving while intoxicated or under the influence of alcohol and failure to have his license in possession were then transferred from the District Court to the circuit court. Webber pleaded guilty to driving while intoxicated; the State nolle prossed the citation for failure to have a license in possession; and the case proceeded to trial on the homicide charge.

## II

Webber contends that the trial court did not properly construe and apply § 388A of Article 27. He also contends that under proper construction of the statute the evidence was insufficient to sustain his conviction.

The victim was a 48–year–old white female, who was wearing white clothing at the time she was struck. Shortly before the accident, she had been observed in a telephone booth adjacent to a building on the south side of Main Street. According to diagrams made by investigating officers, the distance from the telephone booth to the curb is 19 feet 10 inches; from the curb to the center line of the street is 17 feet 8 inches; and from the center line to the curb on the north side of Main Street is 19 feet 2 inches. The

---

parties stipulated that the pedestrian died as a result of injuries sustained when Webber's car struck her, not from any injuries sustained when run over by the second vehicle.

victim's own automobile was parked along the south curb, two or three car lengths west of the telephone booth. There was a light rain or drizzle and the streets were wet. Traffic was light and, according to one witness, at that time on a Sunday night pedestrians would not normally be present.

Dale Layton, who was driving a Ford truck eastbound behind Webber, noticed nothing unusual or untoward about Webber's driving until he saw the Nissan's brake lights come on and the Pathfinder moved toward the curb as if to park. Then he saw an object that looked to him "like a white sheet and a balloon lying in the road." He applied his brakes and skidded to a stop, straddling the center line. As he exited his vehicle he saw the victim's feet sticking out from under his truck.

At the time of the accident, Blaine Folk was driving his car westerly on Main Street. Called as a witness by the State, Folk testified that he saw the victim just as she stepped off the south sidewalk and right in front of Webber's vehicle, which was going east at a reasonable rate of speed. She appeared to be running. At the time she was struck by Webber's car, the victim was in the eastbound lane, somewhat closer to the center line than to the curb. On cross-examination, Folk was asked whether, in his opinion, the Nissan could have done anything to avoid striking the victim. There was no objection to that question, to which the witness responded, "No." When defense counsel asked Folk if he thought that he, in Webber's position, would have struck the lady as well, the prosecutor objected. By the time the court sustained the objection, Folk had answered, "I think I would have." There was no motion to strike that response. After being hit by the Pathfinder, the victim was thrown several feet east of the point of impact and toward the center of the street. She came to rest lying across the center line, with her feet in the westbound lane.

Photographs of Webber's vehicle show damage to the grill just to the right of the left headlight and a large dent

on the front of the hood above and slightly to the right of the left headlight.

Dave McKenzie, a passenger in Folk's car, also testified for the State. His version was totally at variance from Folk's testimony and, apparently, the State's theory of what had occurred. He agreed that he and Folk were westbound; he said, however, that he saw a figure crossing from his right to his left, *i.e.*, from the north side of the street to the south. He testified that when he first saw the victim she was in the westbound lane, crossing the street, casually walking and looking in her purse. On cross-examination, McKenzie admitted he saw the victim only briefly, just before she was hit; he did not see her leave the sidewalk and enter the street. He saw the victim in the street, being struck, and he did not recall her movements prior thereto.

Webber told the police on the scene, "I didn't see her. She ran out in front of me, and I hit her." In the absence of skid marks or debris on the roadway, the police were unable to determine the point of impact. The State presented an expert witness who, based on Webber's blood alcohol reading at 3:08 a.m., his height and weight, and the fact that he consumed no alcohol for three hours prior to the blood test, rendered an opinion to the effect that Webber's blood alcohol level at midnight would have been at least .27 percent and possibly over .30 percent. At that blood alcohol level, the witness testified, one's peripheral vision tends to be lost, and the subject has tunnel vision, tending only to see that which is directly in front of him.

Webber's motion for judgment at the conclusion of the State's case being denied, he called several witnesses to establish that the victim was extremely depressed shortly before the accident. Webber's passenger supported his version of what occurred, that the victim suddenly appeared in front of them, that Webber was driving 25 to 30 miles per hour. An expert in traffic dynamics and accident reconstruction, called as a defense witness, testified that an average woman, crossing a street at a brisk pace or "jogging" would be moving at an average rate of 12.5 feet per

second. Considering that the victim would have to be some distance (a car width) into the street before she would be visible to an eastbound motorist (because of her own parked car to her west), and taking into account normal reaction and braking time, the witness opined that no motorist in Webber's position, no matter how sober or alert, could possibly have avoided hitting the victim. Webber did not testify.

In arguing for an acquittal, defense counsel posited that a conviction of homicide by motor vehicle while intoxicated requires proof of more than a combination of driving while intoxicated and someone's death; it requires proof of some negligent conduct that is the cause of death. The court found no evidence of excessive speed, crossing the center line, or operating recklessly or carelessly. In fact, it found "little evidence of any conduct that would be considered negligence." Nevertheless, the court concluded that operating a motor vehicle while intoxicated, particularly if intoxicated to the extent appellant was on the night of 28 August 1988, was itself an act of negligence within the meaning of the statute, since intoxication impairs a driver's vision, perception, and ability to react. That was sufficient, in the judge's opinion, to justify a conviction. He stated:

> In my view, intoxication alone, even though in this case it may be supplemented by some slight, other slight negligence, satisfies the elements of 388A and that proof beyond a reasonable doubt of other acts of negligence is not required. The facts are clear that the Defendant was intoxicated, that there was a death, and that the death was caused by the victim having been struck by Defendant's vehicle. I am satisfied that the State has proved the elements of the offense beyond a reasonable doubt.

Having concluded that proof of appellant's intoxication and death of the victim as a result of being struck by appellant's vehicle were sufficient to justify a conviction, the trial judge did not address the issue of causal relationship between the motorist's intoxicated state and the death of the victim. We now proceed to do so.

### III

The language of § 388A certainly imports a requirement that there be a causal relationship between the intoxicated motorist's negligence and the death of another person:

> Any person *causing* the *death* of another *as the result of* the person's *negligent driving* ... while intoxicated.... (Emphasis added.)

The adjective "negligent" modifies "driving." It is not enough to show that the motorist was intoxicated and that the death of another person resulted from the motorist's act of driving a motor vehicle; the plain meaning of those words is that the death must result from *negligent* driving.

The cardinal rule of statutory construction is to ascertain and carry out the legislative intention. *Kaczorowski v. City of Baltimore,* 309 Md. 505, 525 A.2d 628 (1987); *Guardian Life Ins. v. Ins. Comm'r,* 293 Md. 629, 446 A.2d 1140 (1982); *Vallario v. State Roads Comm'n,* 290 Md. 2, 426 A.2d 1384 (1981). As Judge Adkins pointed out for this Court in *Kaczorowski,* the plain-meaning rule is a principal canon of statutory construction. We look to the words of the statute to discover what the Legislature intended to accomplish by it "because what the Legislature has written in an effort to achieve a goal is a rational ingredient of analysis to determine that goal." 309 Md. at 513, 525 A.2d 628. But the plain-meaning rule is not rigid; " 'the meaning of the plainest language' is controlled by the context in which it appears." *Id.* at 514, 525 A.2d 628.

We find nothing in the scant legislative history of this statute to indicate that the Legislature intended it to accomplish any purpose inconsistent with the plain meaning of the words employed.

Section 388A of Article 27 originated in the Senate as a pre-filed bill, Senate Bill 318, introduced by Senator Rosalie Abrams. In a statement she submitted to the House Judiciary Committee, Senator Abrams explained that Senate Bill 318 was intended to deal with the problem of the drinking

driver, a major factor in at least half of all automobile accidents in the United States. With respect to the existing offense of manslaughter by motor vehicle, Senator Abrams continued, the concern of law enforcement agencies has been the difficulty of proving "gross negligence," *i.e.*, "wanton and willful" conduct. Senate Bill 318 was intended to create a lesser offense than manslaughter, one not requiring proof of gross negligence, to be applied in cases when operation of a motor vehicle while intoxicated results in a homicide.

The Maryland Department of Transportation supported the bill because it would create a new offense requiring a lesser burden of proof for conviction than the existing offense of manslaughter by automobile. The Department interpreted the bill as one that would require the State merely

> to show that the death of the victim was caused by a motor vehicle while the defendant was driving, operating or controlling that vehicle while in an intoxicated condition. The State would not have to show that the defendant's conduct was grossly negligent in order to sustain a conviction.

The Department also viewed the bill as akin to a provision in the Uniform Vehicle Code captioned "Homicide by Vehicle," which "requires only that the defendant unlawfully violate a state traffic law while using a vehicle that results in the death of another and that it was the proximate cause of a death."

When first introduced, the bill did not contain the word "negligent"; it read:

> ANY PERSON CAUSING THE DEATH OF ANOTHER AS A RESULT OF HIS DRIVING, OPERATION, OR CONTROL OF A MOTOR VEHICLE WHILE INTOXICATED IS GUILTY OF A MISDEMEANOR—

Several amendments were made to the bill in the Senate Judicial Proceedings Committee. Amendment No. 4 insert-

ed "NEGLIGENT" between "HIS" and "DRIVING." A handwritten note explained that this insertion

> serves only to make it clear that if John Doe is intoxicated and is lawfully stopped at a stop sign and is hit in the rear, his mere intoxication, *alone*, is not enough to subject him to the rigors of the statute.

The legislative purpose, it is clear, was to alleviate the problem of the drinking driver as a cause of death on the highways by creating a new criminal offense that was easier to prove than manslaughter if an intoxicated driver caused someone else's death. The goal was to create a lesser offense requiring proof of a lesser degree of negligence than gross negligence. The plain meaning of the statute is entirely consistent with that goal.

The trial court erred, therefore, in concluding that proof that the victim died as a result of being struck by appellant's vehicle while he was driving while intoxicated constituted proof of all the elements of the offense.

### IV

■ Having determined that a causal relationship between the intoxicated driver's negligent operation of his motor vehicle and the death of another person is an essential element of the crime of homicide by motor vehicle while intoxicated, we must now consider whether the State presented evidence sufficient to prove that element. As pointed out in *Warfield v. State*, 315 Md. 474, 554 A.2d 1238 (1989), the Double Jeopardy Clause of the Fifth Amendment precludes a retrial if a reviewing court finds the evidence legally insufficient to support conviction. *Tibbs v. Florida*, 457 U.S. 31, 40–42, 102 S.Ct. 2211, 2217–18, 72 L.Ed.2d 652 (1982). If there is a reversal on any other ground, the Double Jeopardy Clause does not preclude a retrial of the defendant on the same charge. *Huffington v. State*, 302 Md. 184, 189, 486 A.2d 200 (1985).

■ In reviewing the sufficiency of the evidence to support a conviction, "the standard to be applied is ' "whether

the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." ' " *Reed v. State,* 316 Md. 521, 526, 560 A.2d 1104 (1989) (quoting *Johnson v. State,* 303 Md. 487, 510, 495 A.2d 1 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986), which quoted from *Jackson v. Virginia,* 443 U.S. 307, 318, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560, 573 (1979)). In *Tichnell v. State,* 287 Md. 695, 717, 415 A.2d 830 (1980), this Court observed:

> This standard does not require a court to " 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' " [*Jackson v. Virginia,* 443 U.S. 307 at 318–19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)] (emphasis in original). Instead, the standard to apply is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 [99 S.Ct. at 2789] (emphasis in original).

Applying that standard to the evidence adduced at the trial of this case, we believe that, even viewing that evidence in a light most favorable to the State, all of the elements of the offense proscribed by Article 27, § 388A, as we have construed it, cannot be found.

It was incumbent upon the State to prove, not merely that appellant was intoxicated when he drove the automobile that struck and killed the victim, but also that his negligence caused the victim's death. Since the only evidence of negligence was appellant's intoxicated state, unless a sober driver with normal reflexes would have been able to avoid running into the victim under the same circumstances that confronted appellant, appellant's conduct in driving his vehicle while in a highly intoxicated state was not a cause of the victim's death. In our view, the evidence describing those circumstances is inadequate to establish that causal relationship.

The pedestrian, whether running, jogging, or walking, traversed something over half the 17 foot width of the

eastbound lane of Main Street after stepping off the curb before she was struck.  For the first part of that distance she may have been screened from appellant's view by her own parked car, a station wagon, that was to her left.  How much distance appellant traveled in the same amount of time it took the victim to reach the point of impact from the place where she became visible to appellant would depend upon his speed.  The only witness who quantified the speed of appellant's vehicle was his passenger, who gave an estimate of 25 to 30 miles per hour.  State's witness Layton, who described his own speed as 15 to 20 miles per hour and State's witness Folk, who said he was going 20 to 25 miles per hour, declined to estimate appellant's speed but agreed that it was reasonable.  It simply cannot be determined from the evidence how close appellant was to the victim when she darted out into the street.  The distance could not have been very great;  whether it was enough to have enabled a sober man of average reflexes to avoid the accident is pure speculation.  That does not suffice for proof of guilt beyond a reasonable doubt.

JUDGMENT OF THE CIRCUIT COURT FOR ALLEGANY COUNTY REVERSED.

COSTS TO BE PAID BY ALLEGANY COUNTY.