600 A.2d 430

**Robert Lee McMILLIAN**

v.

**STATE of Maryland.**

**No. 13, Sept. Term, 1991.**

Court of Appeals of Maryland.

Jan. 24, 1992.

274

Edward Smith, Jr. (Cummings and Smith, P.A., on brief), Baltimore, for petitioner.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

KARWACKI, Judge.

Robert Lee McMillian was convicted by a jury in the Circuit Court for Baltimore City of conspiracy to distribute cocaine and maintaining a building as a common nuisance. He was sentenced to concurrent terms of ten years imprisonment. The Court of Special Appeals affirmed those judgments. *McMillian v. State*, 85 Md.App. 367, 584 A.2d 88 (1991). We granted certiorari to consider the following issues: (1) whether the police acted reasonably under the Fourth Amendment when they entered the social club managed by McMillian without a warrant and thereafter searched the club pursuant to McMillian's consent; and (2) whether the evidence was sufficient to support McMillian's convictions.

## I.

This case originated from an investigation by the Baltimore City Police Department of the Foxes & Vixens Club (the Club), a private social club[1] located at 1601 West

---

1. At the suppression hearing, Officer Rood described the Club as "a social club that sells liquor," albeit without a liquor license. Rood also explained that he had learned from McMillian that a person need

Lexington Street in Baltimore City. At a pre-trial hearing on McMillian's motion to suppress the cocaine seized at the Club, the State offered the following evidence to justify the warrantless search of that premises on December 29, 1988. On that day, at approximately 3:00 p.m., Baltimore City Police Officer James Rood spoke to a "reliable source" who informed him that someone at the Club was selling drugs. The Western District Drug Enforcement Unit, of which Rood was a member, had previously received numerous complaints about the sale of controlled dangerous substances from that location.

After receiving this information from his source, Officer Rood proceeded to the vicinity of the Club to investigate. He had previously obtained permission from the owner of a construction trailer located fifty to sixty feet from the Club to use the trailer for covert surveillance of the premises. Officer Rood made observations from the trailer and communicated by radio with fellow officers who were stationed out of the line of sight of people at the Club. These officers planned to arrest people designated by Rood who were seen leaving the Club and suspected of illegal activity.

Initially, Officer Rood observed eight or nine people standing outside the Club's entrance. He saw a black female exit the Club and disperse small objects, which Rood believed to be controlled dangerous substances, to five or six people outside the Club. Officer Rood ordered that the people receiving these packages be stopped. Thereafter, police stopped and arrested LaTanya Lee who was in possession of one glassine bag of cocaine.

Officer Rood also observed people engaging in conversation outside the Club. He noticed these people handing currency to an unidentified person inside the Club, and receiving, from that unidentified person, a small object. Officer Rood watched this type of transaction occur between 20 and 30 times. As a result of his observations,

---

not be a member to enter and that McMillian doesn't know many of the people who come into the Club.

Officer Rood ordered the stop and arrest of Bryant Livers and Darryl Lightner as they walked away from the Club. From Livers, police recovered two glassine bags of cocaine; from Lightner, police recovered a glass vial containing a white powder, which later was determined not to be a controlled dangerous substance.

At approximately 4:40 p.m., the police also stopped a woman driving an automobile who had briefly entered the Club. The woman immediately told the police that she had just stopped inside the Club to see a friend, that she did not have anything, and that she had not done anything. Concerned that this woman might jeopardize their operation by revealing their covert surveillance, the police told the woman that they had not known that she had been at the Club and that they had stopped her for another reason.

Rood identified McMillian and Curley Jackson as two men whom he saw standing outside the Club and directing people to the door of the Club. Rood never saw either of these men distribute drugs, but he did see them watch drug transactions occur. Rood also identified Arthur Lee Carter as the person who delivered drugs to LaTanya Lee. Rood also observed a man dressed in black clothing who had a key to the apartment that adjoined the Club. This person was seen going in and out of the Club, talking to people who were waiting outside the Club, and was seen observing drug transactions occur. Rood suspected that this man was involved in the drug transactions.

Throughout his surveillance, Officer Rood was in radio contact with Sergeant Bert Ricassa, his superior, and the officer in charge of the investigation, Agent Timothy Devine, as well as Sergeant John Slawinski and Officers Clarence Smith and Clifton Mazer. A transcript of the conversations between these police officers was introduced into evidence. That transcript recorded ongoing conversations between the officers regarding what measures they should and could take in light of Rood's observations of the Club. Consideration was given to obtaining a search and seizure warrant, but Officer Rood was concerned that by

the time police applied for and obtained a warrant the drug distributors would have vacated the Club or the drug sales would have concluded. Alternatively, consideration was given to securing the premises and either seeking consent to search from the owner or manager of the Club or obtaining a search warrant.

At approximately 5:50 p.m., Rood left his observation post and returned to the Western District police station for about one hour to meet with Ricassa and other officers involved in the investigation of the Club. No direct observation was made by the police from 5:50 p.m. to 6:48 p.m., although Rood advised Ricassa that "I'm gonna have somebody watch this place for me. And if everybody leaves they're gonna notify us."

Once at the station, Ricassa decided that rather than attempt to get a search and seizure warrant in the first instance, the officers would return to the Club and secure the place, holding everybody there while they attempted to obtain a consent to search the premises. If they could not obtain such a consent, the police intended to detain those inside the Club until they could obtain a search and seizure warrant. Ricassa was concerned that if the premises were not immediately secured, that Club patrons might learn of the police surveillance by overhearing the radio communications between him and the other officers and that the drug distributors might leave the premises before a search and seizure warrant could be obtained. It was also decided that Officer Mazer would "slip in" with a patron rather than knocking on the door of the Club.

The police returned to the vicinity of the Club at approximately 6:48 p.m. Officer Mazer, wearing a police uniform, gained entry at approximately 7:05 p.m. by waiting until a patron went to the door of the Club and sought to enter. The door to the Club was opened by McMillian, who upon seeing Mazer began yelling "police" and tried, unsuccessfully, to shut the door to bar Mazer's entry. Unable to make radio contact with Officer Mazer, Rood ordered the other officers at the scene to enter the Club.

Inside the Club, the officers found approximately 20 to 25 people, including McMillian, who were detained and patted down for weapons. The police determined that McMillian was the manager of the Club. McMillian inquired whether the police had a search warrant. Rood testified that he and McMillian, who appeared to Rood to be about fifty-five years of age, discussed the issue of consent to search in the back room of the Club. Two or three people, both officers and civilians, were standing in the doorway. No guns were drawn by the police officers, and although not free to leave, McMillian was not formally placed under arrest or hand-cuffed.

Rood advised McMillian of the police surveillance of the Club that had occurred during the afternoon and that the authorities believed that he was involved with drug transactions. McMillian responded that he knew that the police "were coming and that he had to make a living somehow." Officer Rood explained that the police wished to obtain McMillian's consent to search the premises. If McMillian opted not to provide consent, Officer Rood explained that the officers would remain at the premises and that he would return to the station to apply for a search and seizure warrant, which he may or may not be able to obtain from a judge. No threats or promises were made to him. McMillian signed the consent form five to ten minutes after the police entered the Club. The form that McMillian signed stated that he was aware of his right to refuse the search. The form also stated that "[t]his written permission is being given by me to the above-named officer voluntarily and without threats or promises of any kind."

The ensuing search resulted in the seizure of a total of 59 glassine bags of cocaine: nine bags were found in a garbage can, 25 bags were found inside a Kool cigarette pack in the back room, and a manila pack of 25 bags was located in the center room where cards were being played. Also, a vial of white powder was found near the telephone.

The trial court denied McMillian's motion to suppress, concluding that the entry of the Club without a warrant

was justified by the exigencies confronting the police. The court further found that McMillian voluntarily consented to the search of the Club.

## II.

After the denial of McMillian's motion to suppress evidence, the case was tried on the merits before a jury. Arthur Carter and Curley Jackson, who also had been indicted for narcotics offenses and conspiracy with McMillian, each other, and "with certain other persons whose names are to the Jurors aforesaid unknown" to violate the controlled dangerous substance laws, were jointly tried with McMillian. The cocaine seized as a result of the December 29, 1988 search of the Club was admitted into evidence during the trial over McMillian's objection. The jury acquitted both Jackson and Carter of all charges. McMillian was convicted of conspiracy to distribute cocaine and of maintaining a common nuisance building.

In affirming McMillian's convictions, the Court of Special Appeals held that: (1) no exigency existed to justify the warrantless entry into the Club, but that notwithstanding that illegality, under the totality of the circumstances McMillian's consent was voluntary, and therefore the trial court correctly denied McMillian's motion to suppress the evidence, and (2) the evidence was sufficient to support McMillian's convictions.

Thereafter, McMillian petitioned this Court for certiorari. In responding, the State filed a conditional cross-petition for certiorari asking that the holding of the Court of Special Appeals that the police entry of the Club was illegal be reviewed. We granted both petitions.

## III.

### A.

Certain basic principles guide our analysis of the officers' conduct in entering the Club without a search warrant and

thereafter searching the premises pursuant to McMillian's consent.

"The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno,* — U.S. —, —, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297, 302 (1991). Thus, "[t]he Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Id. Accord Maryland v. Buie,* 494 U.S. 325, 331, 110 S.Ct. 1093, 1096, 108 L.Ed.2d 276, 284 (1990); *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605, 613 (1985). Reasonableness is determined by balancing "the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Maryland v. Buie,* 494 U.S. at 331, 110 S.Ct. at 1096, 108 L.Ed.2d at 284. Moreover, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967) (footnotes omitted); *State v. Wilson,* 279 Md. 189, 194, 367 A.2d 1223, 1227 (1977). To sustain the search and seizure here, the State has the heavy burden of showing that one of the exceptions applies. *Coolidge v. New Hampshire,* 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1971); *Vale v. Louisiana,* 399 U.S. 30, 34, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409, 413 (1970); *State v. Wilson,* 279 Md. at 194, 367 A.2d at 1227.

Furthermore, in assessing whether the police conduct in this case was reasonable under the Fourth Amendment, we make our own independent constitutional appraisal. *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990). The factual predicate for this appraisal is that evidence adduced at the suppression hearing that is most favorable to the State as the prevailing party on the motion. *Id.* at 183, 571 A.2d at 1240–41; *Simpler v. State,* 318 Md. 311, 312, 568 A.2d 22, 22 (1990). The trial court's findings as to disputed facts are accepted by this Court unless found to be

clearly erroneous after having given due regard to the lower court's opportunity to assess the credibility of the witnesses. *Riddick*, 319 Md. at 183, 571 A.2d at 1240. With these principles in mind, we consider the legality of the police officers' entry into and search of the Club.

The police entered the Club with the intent to secure the premises and detain its occupants pending either the issuance of a search warrant or receipt of a consent to search the premises. The State contends that this procedure was valid under the "exigent circumstances" exception to the Fourth Amendment's warrant requirement because the police were concerned that if they took the time to obtain a warrant the drugs would be destroyed and the distributor or distributors would leave and no longer be identifiable.

The burden to establish that exigent circumstances justified the warrantless entry of the Club rests with the State. *Coolidge v. New Hampshire*, 403 U.S. at 455, 91 S.Ct. at 2032, 29 L.Ed.2d at 576; *United States v. Jeffers*, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59, 64 (1951); *McDonald v. United States*, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153, 158 (1948). To determine whether exigent circumstances were present, we must limit our review to what the police reasonably believed at the time of their warrantless entry. *Ker v. California*, 374 U.S. 23, 40 n. 12, 83 S.Ct. 1623, 1633 n. 12, 10 L.Ed.2d 726, 742 n. 12 (1963); *Johnson v. United States*, 333 U.S. 10, 17, 68 S.Ct. 367, 370, 92 L.Ed. 436, 442 (1948).

■ What prompted the police to enter the Club without a warrant was their concern that evidence of narcotics violations, in the form of drugs and identifiable drug dealers, would be lost. Useful then are principles that guide a determination of whether the exigent circumstance of risk of destruction or removal of evidence exists.

In *Stackhouse v. State*, 298 Md. 203, 468 A.2d 333 (1983), we discussed exigency at length in the context of risk of destruction or removal of evidence. In that case, the police searched the attic of a home where Stackhouse was arrest-

ed after he was taken out of the attic and handcuffed. The State argued that the presence of Stackhouse's sister, who was free to re-enter the house, presented an exigency because she could have destroyed or removed the evidence. In reaching our decision, we observed that "[w]here the destruction or removal of evidence is urged as justifying a warrantless search, there must be a situation where there was an immediate, urgent, and compelling need for the police action." *Id.* at 216, 468 A.2d at 340. Applying that test, we held that the State had not met its burden to prove exigent circumstances to justify the warrantless search of the attic. *Id.* at 220, 468 A.2d at 342.

The police officers in the instant case engaged in surveillance of the Club from 3:00 p.m. until they returned to their station house to meet with Sergeant Ricassa at approximately 5:50 p.m. No police officers were present to observe any activities for the next hour. Any exigencies that existed during those afternoon hours were apparently insufficient in the eyes of the police to justify a warrantless search during that time frame. Indeed, had there been sufficient immediate urgency to justify a warrantless search, Sergeant Ricassa would not have convened the station house meeting, leaving no officers behind to maintain the vigil at the Club.

Moreover, the suppression hearing record is completely silent as to any attempts by police to confirm that the suspected illegal activities which they had observed earlier that day were ongoing at the Club when they returned at 6:48 p.m. Rather, the tape transcript introduced into evidence reflects that police returned at 6:48 p.m. and that the first attempt to enter the Club occurred at 6:52 p.m. No discussions recorded on that tape or testimony during the suppression hearing indicate that any drug trafficking had been observed or that the three chief suspects, including McMillian, or any other persons were present at that time. The police merely waited for a Club patron to approach the door to enable one of them to enter the Club behind that person. The police erred by assuming that any illegal

conduct present when they departed at 5:50 p.m. continued until they returned at 6:48 p.m. As a result, any exigencies existing prior to the station house meeting effectively dissipated during the lapse in surveillance. The police did not engage in any further surveillance upon returning to the premises; therefore, "the police could not have believed that evidence was likely to be destroyed or removed because at that point in time they did not know that there was any evidence." *Stackhouse*, 298 Md. at 221, 468 A.2d at 343. *See Shuman v. State*, 83 Md.App. 319, 323–25, 574 A.2d 345, 347–48 (1990) (any exigencies which existed at time when police officer entered apartment to justify officer's warrantless search of guitar case had ceased when police restrained defendant's freedom of movement or discovered the guitar case was locked). This fact distinguishes the case *sub judice*, from the line of cases where the police knew that narcotics were present on the premises and other persons were likely to destroy the easily disposable contraband. *See Thomas v. Parett*, 524 F.2d 779 (8th Cir.1975); *United States v. Rubin*, 474 F.2d 262 (3rd Cir.), *cert. denied*, 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973); *Henson v. State*, 236 Md. 518, 204 A.2d 516 (1964).

Inasmuch as there were no exigent circumstances at the time of the warrantless entry, that entry was unlawful. Consequently, the Court of Special Appeals properly applied this Court's directives in *Stackhouse*.

### B.

We now focus on McMillian's consent to the search of the Club and the effect upon that consent of the illegal entry of the Club by the police.

A search that is conducted pursuant to consent need not be supported by a warrant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854, 858 (1973); *Gamble v. State*, 318 Md. 120, 123, 567 A.2d 95, 97 (1989). The State bears the burden of proving that the consent was freely and voluntarily given,

and not the result of duress or coercion. *Schneckloth,* 412 U.S. at 248–49, 93 S.Ct. at 2059, 36 L.Ed.2d at 875; *Gamble,* 318 Md. at 123, 567 A.2d at 97; *Doering v. State,* 313 Md. 384, 401–02, 545 A.2d 1281, 1290 (1988); *Wilson,* 279 Md. at 201, 367 A.2d at 1231. Whether the consent was voluntary "is to be decided in light of the totality of all the circumstances." *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2047–48, 36 L.Ed.2d at 862–63; *Gamble,* 318 Md. at 125, 567 A.2d at 98. Moreover, the State must prove voluntariness by a preponderance of the evidence. *Wilson,* 279 Md. at 201, 367 A.2d at 1231. *See Lego v. Twomey,* 404 U.S. 477, 488–89, 92 S.Ct. 619, 626, 30 L.Ed.2d 618, 627 (1972). This determination "ordinarily involves determination of a question of fact." *Gamble,* 318 Md. at 125, 567 A.2d at 98. Although we are required to make an independent constitutional appraisal of the record, the trial court's factual finding of voluntariness is not to be set aside unless clearly erroneous. *Id.* at 128–29, 567 A.2d at 99–100.

Moreover, we must determine what effect the prior illegal entry had on McMillian's consent. In *State v. Wilson,* 279 Md. 189, 367 A.2d 1223 (1977), we considered the effect of a prior illegality on the voluntariness of a consent to a search. Wilson's residence had been searched previously pursuant to a validly issued search warrant for narcotics and narcotics paraphernalia. Although the police were unsuccessful in finding any narcotics or narcotics paraphernalia, one of the officers jotted down the serial numbers of various TV sets, stereo equipment, speakers, one or two clock radios, a camera and other items which he found in Wilson's bedroom. He later determined from a list of serial numbers of stolen property that a cassette recorder in Wilson's bedroom had been stolen. That officer, in the company of others, returned to Wilson's home the next day and were admitted by Wilson's housemate. When they saw Wilson, one of the officers advised him of his *Miranda* rights, told him that a stolen cassette recorder was seen in his bedroom on the previous day, and requested that he relinquish the recorder. Wilson replied that the recorder was in his bed-

room and led the officer to it. After the serial number on the recorder was verified, it was seized and Wilson was arrested. Wilson's objection to the admission of the recorder into evidence at his trial was overruled, and he was convicted of receiving stolen goods. We affirmed a reversal of that conviction by the Court of Special Appeals, which held that the warrantless search for the serial number of the recorder by the police while executing the search warrant for narcotics and narcotics paraphernalia was unreasonable and that the State had not met its burden of proving that Wilson had freely and voluntarily consented to the subsequent seizure of the recorder. We concluded that when he led the officers to the recorder Wilson reasonably could have believed that the police were acting under the authority of the prior search warrant. We also observed that when Wilson acquiesced to the officers' request to search, one or more of his housemates already had allowed the police to enter the house. Finally, we pointed out that although the police gave Wilson *Miranda* warnings, they did not inform him of his right not to consent to a search. We concluded that "the absence of this advice, coupled with the presence of the *Miranda* warnings, may well have led [Wilson] to believe that he had no right to refuse the officers' request." *Id.* at 203, 367 A.2d at 1232. We discussed the illegal search for and seizure of the serial number of the recorder as a factor that influenced our holding, stating:

"The illegality of a prior seizure, of course, does not automatically render evidence obtained by a subsequent consent search inadmissible, but it is a relevant factor to consider in determining the voluntary nature of the consent. Those cases in which consent has been held voluntary, however, are distinguishable because in each the prosecution presented strong evidence of consent. In all of them, the suspect consented in writing and, therefore, knew he need not consent. In addition, before consenting, the suspect had either volunteered information, discussed his rights with other persons, or denied knowing

either that a crime had been committed or that the evidence sought by the police was in the dwelling. *United States v. Mullens*, 536 F.2d 997, 999 (2d Cir.1976); *United States v. Tortorello*, 533 F.2d 809, 814–15 (2d Cir.), *cert. denied*, [429 U.S. 894] 97 S.Ct. 254 [50 L.Ed.2d 177] (1976); *United States v. Race*, 529 F.2d 12, 14–15 (1st Cir.1976); *State v. Niemszyk*, 303 A.2d 105, 108–09 (Me.), *cert. denied*, 414 U.S. 1042 [94 S.Ct. 544, 38 L.Ed.2d 333] (1973); *State v. Evans*, [21 Or.App. 122] 533 P.2d 1392, 1393–94 (Ore.App.1975). None of those factors, manifestly, is present here."

*Id.* 279 Md. at 203–04, 367 A.2d at 1232–33. (some citations omitted).

The only testimony at the suppression hearing regarding the circumstances under which McMillian signed the consent form was that of Officer Rood. As we have indicated, McMillian and Officer Rood discussed the issue of consent in the back room of the Club. Several people, both police officers and civilians were present, standing in the doorway. Officer Rood described McMillian as appearing to be about 55 years old. Upon being approached by Officer Rood, the first thing that McMillian asked was whether the police had a search and seizure warrant. Rood answered that the police did not have a warrant, but that they had entered the premises with the hope of obtaining a consent to search it. McMillian was apprised of what the police had observed outside, and told that if he did not consent to a search, the police would secure the premises and "try" to get a search warrant. Rood did not tell McMillian that the police would be successful in obtaining a warrant; rather, Rood explained that "either a Judge would sign it or wouldn't sign it." When Rood explained what he had seen outside the Club, McMillian stated that he had known that the police were coming. The consent form signed by McMillian recited that McMillian had been informed of the right to refuse the search.

Rood described McMillian as being "very relaxed." No guns were drawn by the police. Rood did not tell McMillian

that the Club would be searched whether or not a warrant was obtained, or that if consent was given that everyone in the Club would be free to leave. McMillian was not threatened with arrest or jail. Subsequently, McMillian signed the consent authorization form in the back room of the Club.

Based upon this evidence the trial judge found as a fact that McMillian's consent to search the Club was voluntary. Because he erroneously concluded that the entry of the Club by the police was justified by exigent circumstances, he did not weigh that illegal entry along with the other evidence in reaching his conclusion. The issue of whether a consent to search is free and voluntary is initially for the trial court. When an appellate court reviews that conclusion, it makes an independent appraisal of the record, but great weight is accorded to the findings of the trial judge. *Gamble v. State*, 318 Md. at 128, 567 A.2d at 99. In the instant case, the Court of Special Appeals improperly usurped the trial court's role of weighing the effect that the illegal police entry of the Club had on McMillian's consent to the search. *Johnson v. State*, 274 Md. 29, 43, 333 A.2d 37, 44 (1975); *Hartley v. State*, 238 Md. 165, 168, 208 A.2d 72, 73 (1965). Consequently, we shall remand the case to the trial court without affirmance or reversal of the judgments appealed from pursuant to Maryland Rule 8–604(d) so that its decision on McMillian's motion to suppress may be reconsidered. *See* Part V, *infra.*

In determining whether McMillian's consent to the search of the Club was freely and voluntarily given under the totality of the circumstances, on remand the trial judge shall review the evidence that was offered at the suppression hearing in light of the additional fact that the police entered the Club unlawfully. Considering this evidence, it should also decide the related issue of whether McMillian's consent "was sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416–17, 9

L.Ed.2d 441, 454 (1963) (footnote omitted). *See Ferguson v. State,* 301 Md. 542, 548–49, 483 A.2d 1255, 1258 (1984); 3 Wayne R. LaFave, *Search and Seizure,* § 8.2(d), at 189–90 (2d ed.1987). In making that attenuation analysis, *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416, 427 (1975) provides guidance on the factors to be considered: the temporal proximity of the illegal police entry and the consent, the intervening circumstances, and particularly, the purpose and flagrancy of the police misconduct. *Cf. United States v. Oguns,* 921 F.2d 442, 447–48 (2d Cir.1990); *United States v. Valencia,* 913 F.2d 378, 380–84 (7th Cir.1990); *United States v. Buchanan,* 904 F.2d 349, 353–56 (6th Cir.1990); *Ferguson v. State,* 301 Md. at 549, 483 A.2d at 1258

IV.

McMillian challenges the sufficiency of the evidence before the jury to support his convictions of conspiracy to distribute cocaine and maintaining a common nuisance. This evidence was essentially identical to that offered to the court at the hearing on McMillian's motion to suppress. While each of these arguments implicates different substantive legal principles, and so will be discussed separately herein, the scope of our review is the same for both. In reviewing the sufficiency of the evidence to support a conviction, the standard to be applied is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 318, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560, 573 (1979) (footnote omitted), *quoted in Reed v. State,* 316 Md. 521, 526, 560 A.2d 1104, 1106 (1989); *Johnson v. State,* 303 Md. 487, 510–11, 495 A.2d 1, 13 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986). The appropriate inquiry then is not whether we believe that the evidence at trial established guilt beyond a reasonable doubt; "[i]nstead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential ele-

ments of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573 (emphasis in original); *quoted in Webber v. State*, 320 Md. 238, 247–48, 577 A.2d 58, 63 (1990); *Tichnell v. State*, 287 Md. 695, 717, 415 A.2d 830, 842 (1980).

Measuring the weight of the evidence and judging the credibility of witnesses are always matters for the jury to determine when it is the trier of the facts. *See Hammond v. State*, 322 Md. 451, 463, 588 A.2d 345, 351 (1991); *Reynolds v. State*, 219 Md. 319, 326, 149 A.2d 774, 778 (1959). Furthermore, it is the exclusive function of the jury to draw reasonable inferences from proven facts. *Colvin v. State*, 299 Md. 88, 112, 472 A.2d 953, 965, *cert. denied*, 469 U.S. 873, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984). *See Wilson v. State*, 319 Md. 530, 535–37, 573 A.2d 831, 833–34 (1990).

## A.

The indictment in this case charged a conspiracy to distribute cocaine among McMillian, Jackson, and Carter "together and with each other and with certain other persons whose names are to the Jurors aforesaid unknown." Jackson and Carter were found not guilty of that charge by the jury. The trial court and the Court of Special Appeals subsequently rejected McMillian's argument that his conviction for conspiracy to distribute cocaine must be reversed because of the acquittals of Carter and Jackson.

The inchoate crime of conspiracy, as known in Maryland, is of recent vintage in the common law, dating from the early seventeenth century. *See Cherry v. State*, 18 Md. App. 252, 257 n. 1, 306 A.2d 634, 637 n. 1 (1973). We recently summarized its elements in *Monoker v. State*, 321 Md. 214, 582 A.2d 525 (1990), as follows:

"Our cases have consistently defined criminal conspiracy as the combination of two or more people to accomplish some unlawful purpose, or to accomplish a lawful purpose by unlawful means. The gist of conspiracy is the unlawful agreement, which need not be spoken or formal

so long as there is a meeting of the minds reflecting a unity of purpose and design. The crime is complete when the unlawful agreement is made; no overt act in furtherance of the agreement is necessary. *See, Birchead v. State,* 317 Md. 691, 707–08, 566 A.2d 488 (1989); *Townes v. State,* 314 Md. 71, 75, 548 A.2d 832 (1988); *Mason v. State,* 302 Md. 434, 444, 488 A.2d 955 (1985); *Gardner v. State,* 286 Md. 520, 523–24, 408 A.2d 1317 (1979)."

*Id.* 321 Md. at 221, 582 A.2d at 528. *See Apostoledes v. State* 323 Md. 456, 461–62, 593 A.2d 1117, 1120 (1991).

■ "[I]t is settled that the crime of conspiracy necessarily requires the participation of at least two people." *Gardner,* 286 Md. at 524, 408 A.2d at 1319. Therefore, under the legal tenet known as "the rule of consistency," where the participation of only one person is established, the crime is incomplete. *Id.* As more fully explained by Chief Judge Murphy (now Chief Judge of this Court), when writing for the Court of Special Appeals in *Regle v. State,* 9 Md.App. 346, 264 A.2d 119 (1970), the rationale underlying this rule is that:

"it is illogical to acquit all but one of a purported partnership in crime; that acquittal of all persons with whom a defendant is alleged to have conspired is repugnant to the existence of the requisite corrupt agreement; and that regardless of the criminal animus of the one defendant, there must be someone with whom he confected his corrupt agreement, and where all his alleged co-conspirators are not guilty, a like finding as to him must be made."

*Id.* at 351–52, 264 A.2d at 122. Thus, we must determine whether sufficient evidence at McMillian's trial could reasonably support the conclusion that he and another are guilty of forming an illegal scheme beyond a reasonable doubt.

■ Had McMillian been charged with conspiring only with Jackson and Carter, then, under the rule of consistency his conviction could not stand. In the instant case, how-

ever, no repugnancy in the record exists that requires that McMillian be acquitted. For, as we stated in *Adams v. State*, 202 Md. 455, 97 A.2d 281 (1953), *rev'd on other grounds*, 347 U.S. 179, 74 S.Ct. 442, 98 L.Ed. 608 (1954):

"[W]here an indictment alleges that two defendants conspired with other persons to the grand jury unknown, one of the defendants may be convicted, even though the other was not a party to the conspiracy, if the proof shows that some other person unknown to the grand jury was a party to it."

*Id.* at 459, 97 A.2d at 283. *See Gardner*, 286 Md. at 524–25, 408 A.2d at 1320; *Regle*, 9 Md.App. at 352, 264 A.2d at 123.

 In an effort to extricate himself from the purview of our holding in *Adams*, McMillian argues that the State's evidence at trial failed to show that there were persons other than Jackson and Carter with whom he could be found to have conspired. We eschew that contention. The existence of a conspiracy can be established from circumstantial evidence from which an inference of common design may be drawn. *Gardner*, 286 Md. at 524, 408 A.2d at 1319; *Piracci v. State*, 207 Md. 499, 516, 115 A.2d 262, 269 (1955). A rational juror could have concluded from the following evidence of extensive drug activity in and about the club together with McMillian's admission of a financial stake in that activity that there were persons other than Jackson and Carter with whom he conspired.

In describing what he saw during the surveillance that occurred on December 29, 1988, Officer Rood testified to observing a number of drug transactions. First, Rood related that he saw a black woman exit the Club and distribute small objects to persons who were waiting outside. The group of people, including the woman, immediately dispersed and were never apprehended.

Second, Rood described the drug transaction involving Bryant Livers, distinguishing his dealer from the person who sold drugs to LaTanya Lee. Rood noticed that the individual who delivered drugs to Lee had unusual clothing

on his arm, which Rood later recognized and relied upon to identify Carter. By contrast, Rood said that there was nothing unusual about the clothing on the arm of the person who dealt drugs to Livers from inside the Club. Rood also denied seeing Carter distribute drugs to anyone other than Lee. Both Lee and Livers received cocaine. In addition, Rood observed that on approximately 20 to 30 occasions people outside the Club handed currency to someone inside the Club and received a small object in return.

Third, Rood testified that McMillian was "directing the purchasers to the door" of the Club.

Finally, once the police entered the Club, they found 59 glassine bags of cocaine, weighing in excess of 72 grams. McMillian, who admitted to being the manager of the Club, explained his involvement with the drug activity at the Club in a statement to Rood. Rood testified as follows concerning that statement:

> "I said after I explained to him about that I had been watching drug transactions for hours, he stated I knew you were coming, and I stated why is an elderly man like you involved with drugs like this. He stated because I have to make a living somehow."

Convictions of conspiracy with named co-conspirators and "with persons unknown" have been upheld in other jurisdictions, notwithstanding the acquittal of the named co-conspirators, based upon circumstantial evidence of the complicity of the unknown co-conspirators in the conspiracy; e.g., *United States v. Price*, 869 F.2d 801, 804–05 (5th Cir.1989); *United States v. Mosquera*, 779 F.2d 628, 630 (11th Cir.1986); *United States v. Bell*, 651 F.2d 1255, 1258 (8th Cir.1981); *Prichard v. United States*, 181 F.2d 326, 330–31 (6th Cir.), *aff'd* 339 U.S. 974, 70 S.Ct. 1029, 94 L.Ed. 1380 (1950); *People v. Sagehorn*, 140 Cal.App.2d 138, 146–47, 294 P.2d 1062, 1068 (Cal.Dist.Ct.App.1956).

Accordingly, we agree with the trial court and the Court of Special Appeals and decline to set aside McMillian's conspiracy conviction. With the evidence before it, having

been instructed on the elements of conspiracy, and that "[t]he Defendants are charged with conspiring together and with each other and certain other unknown persons to violate the laws of the State of Maryland with respect to the narcotic laws," the jury was not inconsistent in convicting McMillian while it acquitted Jackson and Carter.

### B.

■ McMillian also stands convicted of Maryland Code (1957, 1987 Repl.Vol.), Article 27, § 286(a)(5), which makes it a crime for any person

"[t]o keep or maintain any common nuisance which means any dwelling house, apartment, building, vehicle, vessel, aircraft, or any place whatever which is resorted to by drug abusers for purposes of illegally administering controlled dangerous substances or which is used for the illegal manufacture, distribution, dispensing, storage or concealment of controlled dangerous substances or controlled paraphernalia, as defined in § 287(d) of this subheading."

Under this statute, an essential element of the offense of common nuisance is its recurring nature. *Skinner v. State*, 16 Md.App. 116, 129, 293 A.2d 828, 836, *cert. denied*, 267 Md. 744 (1972). The essence of this crime is the potential danger to the public posed by the continuing and recurring character of the offense on such premises and not whether the premises are open to the public. *Baldwin v. State*, 56 Md.App. 529, 536, 468 A.2d 394, 397 (1983).

■ The issue presented is whether the evidence adduced at trial was legally sufficient to show that the Club managed by McMillian was used for proscribed drug activities on a recurring basis. Although we have not previously addressed this particular issue, in *Hunt v. State*, 20 Md. App. 164, 314 A.2d 743, *cert. denied*, 271 Md. 738 (1974), the Court of Special Appeals examined the sufficiency of evidence to prove acts constituting a common nuisance. The Court of Special Appeals rejected the notion "that because

evidence is found only on a single occasion it cannot be sufficient to show a crime of a continuing nature." *Id.* 20 Md.App. at 166–67, 314 A.2d at 744. Instead, it fashioned a test that looks to the circumstances of the case and the inferences properly drawn therefrom. *Id.* at 167–69, 314 A.2d at 744–45. In formulating this test, the court relied on Chief Judge Murphy's analysis in *Ward v. State,* 9 Md.App. 583, 267 A.2d 255 (1970), discussing the recurring nature of the common law offense of keeping a disorderly house, stating:

> "[T]here is no particular extent of time prescribed during which the improper practices must continue or recur; each case must be adjudged according to its own circumstances. It is usually deemed sufficient if, when the character of the culpable acts and the circumstances under which they were committed are taken into account, it appears that they were repeated often enough to warrant an inference that the house was kept for the indulgence of such practices."

*Id.* at 593, 267 A.2d at 261. Thus, the test of sufficiency, as enunciated by the Court of Special Appeals looks to the circumstances of the case and the inferences properly drawn therefrom. *Id.* 20 Md.App. at 167–69, 314 A.2d at 744–45. Furthermore, the Court of Special Appeals held that there is no particular extent of time prescribed during which the improper practices must continue or recur, and each case must be adjudged according to its own circumstances. *Hunt,* 20 Md.App. at 166–67, 314 A.2d at 744. This test is completely compatible with the standard pursuant to which sufficiency of the evidence is assessed generally: "whether the evidence shows directly or supports a rational inference of the facts to be proved, from which the trier of fact could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged." *Wilson v. State,* 319 Md. at 535–36, 573 A.2d at 834. We adopt this test and will apply it to the evidence supporting McMillian's conviction.

Although the evidence in this case was restricted to what the police saw and heard during approximately four hours of a single day, during that time the police observed the consummation of a number of drug transactions involving a number of different, transient buyers. These transactions were conducted from a non-mobile structure used as a social club. Seized from the Club were 59 glassine bags of cocaine, weighing in excess of 72 grams. When McMillian, the manager of the Club, was asked why he was involved with the drug activity occurring at the Club, he responded that he had to "make a living somehow."

From this evidence, the jury could reasonably have inferred that McMillian was maintaining a building that was being used on a recurring basis to distribute, dispense, store or conceal drugs. In sum, the character of the inculpatory acts and the circumstances under which they were being committed adequately supported the jury's verdict that McMillian was maintaining a common nuisance in violation of Article 27, § 286(a)(5).

## V.

The remand of this case to the trial court for the reasons expressed in Part III, *supra,* will be a limited one pursuant to Maryland Rule 8–604(d) [2] since the sole issue to be determined is whether the evidence seized in the course of the search of the Club should have been suppressed. That issue will be resolved by the trial judge upon the evidence offered at the hearing in McMillian's motion to suppress.

---

**2.** Maryland Rule 8–604(d) provides in pertinent part:

"(1) *Generally.*—If the Court concludes that the substantial merits of a case will not be determined by affirming, reversing or modifying the judgment, or that justice will be served by permitting further proceedings, the Court may remand the case to a lower court. In the order remanding a case, the appellate court shall state the purpose for the remand. The order of remand and the opinion upon which the order is based are conclusive as to the points decided. Upon remand, the lower court shall conduct any further proceedings necessary to determine the action in accordance with the opinion and order of the appellate court."

The jury at McMillian's trial had no role to play in the resolution of that factual determination. *Wiener v. State,* 290 Md. 425, 438, 430 A.2d 588, 596 (1981) (when an appellate court is confronted with unanswered factual questions about collateral matters in a criminal case, a limited remand is appropriate to allow the trial court to resolve those collateral matters). *See also Reid v. State,* 305 Md. 9, 15–16, 501 A.2d 436, 439–40 (1985) (limited remand to determine whether letters which defendant sought to introduce in sentencing phase of capital case were genuine or bogus); *Bailey v. State,* 303 Md. 650, 659, 496 A.2d 665, 669 (1985) (limited remand to determine whether discovery violation resulted in prejudice); *Warrick v. State,* 302 Md. 162, 174, 486 A.2d 189, 195 (1985) (limited remand to determine whether State violated discovery rules, and if so, whether any prejudice resulted from violation); *Pennington v. State,* 299 Md. 23, 30–31, 472 A.2d 447, 451 (1984) (limited remand to determine whether delay of trial date violated speedy trial statute and rule); *Grant v. State,* 299 Md. 47, 54, 472 A.2d 459, 463 (1984) (same); *Mahammitt v. State,* 299 Md. 82, 86, 472 A.2d 477, 479 (1984) (same). *Bates v. State,* 64 Md.App. 279, 288–93, 494 A.2d 976, 981–83 (1985) (limited remand to determine whether Fourth Amendment violation occurred and evidence should have been suppressed).

If the trial court upon reconsideration concludes that McMillian's motion to suppress should be granted, the judgments should be vacated, and a new trial shall be ordered. On the other hand, if the trial court decides that the motion should be denied, the judgments on McMillian's convictions will stand and he may appeal that determination.

JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED AND THE CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE CASE, WITHOUT AFFIRMANCE OR REVERSAL, TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR THE PURPOSE OF RECONSIDERATION OF THE MOTION BY PETITIONER TO SUPPRESS EVIDENCE. THE JUDG-

MENTS OF THE CIRCUIT COURT REMAIN IN EFFECT UNLESS VACATED BY THE CIRCUIT COURT IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THE FOREGOING OPINION. COSTS IN THE CIRCUIT COURT FOR BALTIMORE CITY, THE COURT OF SPECIAL APPEALS, AND IN THIS COURT TO ABIDE THE RESULT.